[No. 17972-9-III. Division Three. March 23, 2000.]

RONALD J. HALL, ET AL., *Appellants*, v. SACRED HEART MEDICAL CENTER, ET AL., *Defendants*, DOMINICAN SISTERS OF SPOKANE, *Respondent.*

*Marcia M. Meade* of *Dawson & Meade*, for appellants.

*Clark H. Richards* and *Erika Balazs* of *Lukins & Annis, P.S.*, for respondent.

SCHULTHEIS, J. — Ronald and Kathy Hall appeal a judgment entered in favor of Dominican Sisters of Spokane, a/k/a Dominican Health Services, d/b/a Holy Family Hospital (Hospital)[1] as well as the court's denial of their motion for a new trial. The Halls filed a negligence lawsuit against the Hospital as the result of the alleged subpar care Mr. Hall received in December 1992 when he was brought to the Hospital's emergency room and later admitted to the intensive care unit (ICU). We affirm.

Mr. Hall was diagnosed with renal cancer in December 1992. As a result, his left kidney was removed at Sacred Heart Medical Center (SHMC) by Dr. C. Frederick Hollon, a urologist. A few days after his release from SHMC, Mr. Hall was seen in the emergency room of Holy Family Hospital complaining of shortness of breath and pain in his upper chest.

Dr. Peter Nelson was the emergency room physician on call on December 22, 1992, when Mr. Hall arrived at the Hospital. After learning of Mr. Hall's recent surgery at SHMC, Dr. Nelson's initial diagnosis was that Mr. Hall was suffering from a pulmonary embolism, which is a blood clot in the lungs, a potentially lethal medical condition. Because his medical condition was critical, Dr. Nelson referred Mr. Hall's care to Dr. LeRoy Byrd, an experienced internist at the Hospital.

---

[1]The Hospital originally filed a cross-appeal on the trial court's decisions regarding jury instructions and certain evidentiary issues. It later withdrew the cross-appeal; thus, no briefing was supplied on the issues.

Dr. Byrd also suspected a pulmonary embolism or some type of infection and took steps to dissolve the blood clot with heparin and started Mr. Hall on an antibiotic to fight any potential infection. Diagnostic tests completed a short time later ruled out the diagnoses of pulmonary embolism, infection and/or myocardial infarction. Because his physician did not know with medical certainty what the diagnosis was, Mr. Hall was admitted to the Hospital's ICU. Dr. Byrd wrote out a list of 17 orders relating to Mr. Hall's care that were to be carried out by the Hospital staff.

The parties dispute the meaning of Dr. Byrd's instruction 14.[2] The Halls maintain it was a direct order to the Hospital nursing staff to immediately contact Dr. Hollon, who had performed the kidney surgery the prior week. However, in his testimony at trial, Dr. Byrd explained that the order was meant as a courtesy note to inform Dr. Hollon that his former surgical patient was now in the ICU at the Hospital. Dr. Byrd clarified that there was no need to immediately contact Dr. Hollon because Dr. Hollon did not treat pulmonary embolism, which was the working diagnosis at the time the orders were written. Although no one contacted Dr. Hollon directly, his paging light was lit in the physician's lounge at the Hospital. This served to notify him that he had a Hospital message waiting.

Dr. Byrd followed Mr. Hall's progress all day on December 22, 1992. He did an examination of Mr. Hall at about 9:30 P.M., just before he left for the evening. At that time Mr. Hall was breathing easier, was more comfortable, his vital signs were more stable and his urine output was good. Dr. Byrd also did an examination of Mr. Hall's abdomen and found it normal. However, because of an abnormal result from a test that measures kidney function, Dr. Byrd ordered a CAT scan to be done the following morning. He said that there was concern that Mr. Hall might have an intra-abdominal abscess that had not been noted in the ultrasound test that had been performed earlier in the day. Dr.

---

[2]The handwritten note read,
"Dr. Hollon-Corbett et al to see follow."

Byrd testified that the ultrasound did not reveal any abnormality in Mr. Hall's spleen. Dr. Byrd went off call at 7:00 A.M. the next morning and did not see Mr. Hall again until the day prior to his discharge.

Dr. Hollon learned of Mr. Hall's admission to the Hospital's ICU the next day, December 23. His examination of Mr. Hall revealed a distended abdomen and no bowel sounds. Dr. Hollon suspected a postoperative bleed and ordered aggressive fluid and blood resuscitation. He also suggested a surgical consult. Dr. Hollon contacted Dr. Bruce Bouma, a general surgeon, who was familiar with intra-abdominal surgeries. Dr. Bouma recommended waiting and watching to see if the bleeding would stop on its own. It did not and Dr. Bouma ultimately removed Mr. Hall's lacerated spleen later that evening, with Dr. Hollon present. In Dr. Hollon's opinion, the operation probably saved Mr. Hall's life.

The Halls originally filed a complaint for damages, alleging negligence, against the Hospital, Dr. Nelson, Dr. Hollon, and SHMC. The complaint alleged that as a result of the defendants' conduct, Mr. Hall suffered serious bodily injury and his wife, Ms. Hall, suffered an injury to her marriage. The Halls requested damages for their injuries as well as for pain and suffering, loss of income, loss of consortium and other damages. The Halls later dismissed all the defendants except the Hospital.

A jury trial was held in Spokane County Superior Court in July 1998. Once both sides had presented their evidence, the Hospital requested a directed verdict. The motion was denied. Jury instructions were decided upon, with both sides having objections to certain of the court's decisions. The jury determined that the Hospital was not negligent and a judgment to that effect was entered. The Halls requested a new trial. The motion was denied. This timely appeal followed.

## DISCUSSION

The Halls first contend that the trial court abused its

discretion when it allowed the Hospital's physician witnesses to give their opinion regarding the standard of care exercised by the nurses involved in Mr. Hall's care while he was a patient at the Hospital. The Halls assert that only another registered nurse should be allowed to testify as to the appropriate standard of care of the ICU nurses. Because the Hospital allegedly presented standard of care evidence through Dr. Byrd and Dr. Gregory Luna, the Halls assert the judgment should be overturned and a new trial granted.

■■ Expert opinion testimony on scientific, technical or specialized knowledge is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." ER 702. The trial court makes the initial determinations regarding whether the witness qualifies as an expert and whether the testimony would be helpful to the trier of fact. *In re Personal Restraint of Young*, 122 Wn.2d 1, 57-58, 857 P.2d 989 (1993). We review the trial court's admission or rejection of expert testimony for an abuse of discretion, which is a decision that is manifestly unreasonable or based on untenable grounds. *State v. Stenson*, 132 Wn.2d 668, 701, 715, 940 P.2d 1239 (1997).

Dr. Byrd testified that he was Mr. Hall's treating physician on the day Mr. Hall was admitted to the Hospital. He also testified that he had worked with the nurses involved in Mr. Hall's care since they were hired by the Hospital and got along well with them. Dr. Byrd told the court he did not expect the Hospital nurses to make medical diagnoses for his patients although he admitted that he heavily relied on their observations of the patients when making his medical diagnoses. Over the Halls' objection, the Hospital was allowed to ask Dr. Byrd whether there was any information that was not given to him by the ICU nurses working with Mr. Hall or whether there were any tests that were not carried out by the Hospital staff that would have enabled Dr. Byrd to have diagnosed and/or repaired Mr. Hall's bleeding spleen earlier than it was. He said there was not.

Nowhere in his trial testimony do we find that Dr. Byrd

testified as to what degree of skill, care and learning would be expected of a reasonably prudent nurse in the Hospital's ICU on December 22-23, 1992. The Halls' contention on this issue is, at least as it applies to Dr. Byrd, without merit.

Dr. Luna, the codirector of the ICU at the Hospital, also testified. Unlike Dr. Byrd, Dr. Luna was specifically asked if he had "an opinion from reviewing Mr. Hall's chart as to the standard of care of the nurses that were involved in this case?"[3] Counsel for the Halls objected on competency grounds, and the objection was sustained. Counsel for the Hospital then carefully elicited testimony from Dr. Luna that showed he worked with the ICU nurses on a daily basis and relied on the information they provided him. Additionally, in his job as director of the emergency room and the Hospital's ICU he was involved in the education and training of nurses. Finally, he informed the jurors that he was familiar with and knew the standard of care that nurses have to provide to a patient. Over the Halls' objection, Dr. Luna told the jurors that he believed "the care that was provided was well within—in the standard of care."[4] Later in his testimony, Dr. Luna candidly admitted that he had been given, just prior to his testimony, a copy of the definition of the standard of care of a critical care nurse, former WAC 246-839-700 (1992).

■ While there is no case law directly on point, special rules have been developed in medical negligence cases, which limit the admission of expert testimony regarding the standard of care of a physician. *See Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 227-28, 770 P.2d 182 (1989). In general, an expert medical opinion is required to establish the standard of care and most aspects of causation in medical negligence cases. *Id.* at 228.

Referring to the *Young* decision, the Halls urge this court to set forth a bright-line rule which states that only a nurse is able to present expert testimony on the standard of care

[3]Report of Proceedings at 672.

[4]Report of Proceedings at 675.

for another nurse under a particular set of circumstances. We decline to do so. As stated by the *Young* court:

> "What is or is not standard practice and treatment in a particular case, or whether the conduct of the physician measures up to the standard is a question for experts and can be established only by their testimony.
>
> ' "The only exception to such rule is that where the want of skill or lack of care is so apparent as to be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it, expert evidence is not essential." ' "

> *Hart v. Steele*, 416 S.W.2d 927, 932, 37 A.L.R.3d 456, 462 (Mo. 1967), quoting *Modrzynski v. Lust*, 88 N.E.2d 76 (Ohio Ct. App. 1949). In fact, not even a medical degree bestows the right to testify on the technical standard of care; a physician must demonstrate that he or she has sufficient expertise in the relevant specialty.

*Id.* at 228-29.

■ In regard to the Halls' concern about the court permitting a medical doctor to testify as to a nurse's standard of care, the court, in its oral decision, stated that it believed that Dr. Luna had the expertise to testify regarding the ICU nurses' standard of care. We agree. From his testimony, it appears Dr. Luna had sufficient medical training and nursing supervisory expertise to testify as to the standard of care expected of critical care nurses. Accordingly, the court properly allowed his testimony and determined it would likely be helpful to the jury in reaching its decision. Under the facts of this case, the court's decision was not manifestly unreasonable. It was not based on untenable grounds or reasons.

Next, the Halls claim the trial court committed reversible error when it refused to give the Halls' proposed jury instruction 17 regarding abandonment and/or neglect.[5] We disagree.

---

[5]The main text of this instruction states:

 We review de novo claimed errors of law in the giving of jury instructions. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995). A reviewing court must look at the jury instructions as a whole when determining whether a court's refusal to give an instruction constitutes reversible error. *State v. Schulze*, 116 Wn.2d 154, 167, 804 P.2d 566 (1991). Jury instructions are sufficient if they permit each party to argue his or her theory of the case, are not misleading, and, when read as a whole, properly advise the trier of fact on the applicable law. *State v. Mark*, 94 Wn.2d 520, 526, 618 P.2d 73 (1980).

 A review of the court's instructions to the jury reveals that the trial court did not err when it refused to give the Halls' proposed instruction 17. This is a medical malpractice action. The court in *Branom v. State*, 94 Wn. App. 964, 969, 974 P.2d 335, *review denied*, 138 Wn.2d 1023 (1999), determined that RCW 7.70.010[6] modified the "procedural and substantive aspects of *all* civil actions for damages for injury occurring as a result of health care, regardless of how the action is characterized." The *Branom* court also reiterated the three legal bases the Legislature set forth on which a plaintiff could recover damages for injury that occurred as a result of health care. They are:

"No award shall be made in *any* action or arbitration for

---

"When a hospital undertakes to treat a patient, the hospital may not abandon the patient. It is the hospital's duty to continue to devote the best attention to the case until either hospital attention is not [sic] longer needed, or the hospital as [sic] given the patient reasonable notice of the hospital's intent to cease to treat the patient, so that another healthcare provider may be obtained by the patient.

"Abandonment of a case by a hospital without sufficient notice or adequate excuse is dereliction of duty, and if damages results [sic] therefrom the hospital is liable for the damages."

[6]RCW 7.70.010 states:

"The state of Washington, exercising its police and sovereign power, hereby modifies as set forth in this chapter and in RCW 4.16.350, as now or hereafter amended, certain substantive and procedural aspects of *all civil actions and causes of action, whether based on tort, contract, or otherwise, for damages for injury occurring as a result of health care* which is provided after June 25, 1976." (Emphasis added.)

damages for injury occurring as the result of health care . . . unless the plaintiff establishes one or more of the following propositions:

(1) That injury resulted from the failure of a health care provider to follow the accepted standard of care;

(2) That a health care provider promised the patient or his representative that the injury suffered would not occur;

(3) That injury resulted from health care to which the patient or his representative did not consent."

*Branom*, 94 Wn. App. at 969 (quoting RCW 7.70.030). Reading the two statutory provisions together, the *Branom* court determined that whenever an injury occurs as a result of health care, the action for damages is governed exclusively by RCW 7.70. *Branom*, 94 Wn. App. at 969.

In their amended complaint filed December 7, 1995, the Halls specifically state that the cause of action against the Hospital is for negligence, which properly falls within the parameters of RCW 7.70.030(1). Specifically, medical negligence is governed by RCW 7.70.040, which provides:

The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:

(1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances;

(2) Such failure was a proximate cause of the injury complained of.

The court's instruction 8 repeats the language of the statute.[7] The Halls' proposed instruction is not a correct

---

[7]The court's instruction 8 states:

"The Defendant, Holy Family Hospital, is a corporation having an independent duty of care to its patients. A corporation can act only through its officers, employees and agents. Any act of omission of an officer, employee or agent is the act or omission of the hospital corporation.

statement of the law. Accordingly, the court's instructions, when taken as a whole, allowed the Halls to argue their theory of the case, which included their allegation that the Hospital nurses did not properly attend to Mr. Hall's needs. The trial court properly refused to give the Halls' instruction regarding abandonment/neglect.

■ ■ Finally, the Halls allege that the trial court abused its discretion when it denied their posttrial motion for a new trial. Denial of a motion for a new trial is within the sound discretion of the trial court. As such, we reverse only for an abuse of that discretion. *State v. Copeland*, 130 Wn.2d 244, 294, 922 P.2d 1304 (1996). A new trial should be granted if, after viewing the evidence in the light most favorable to the nonmoving party (here, the Hospital), the court can say as a matter of law that there is no substantial evidence or reasonable inferences to sustain the verdict for the nonmoving party. *Kohfeld v. United Pac. Ins. Co.*, 85 Wn. App. 34, 41, 931 P.2d 911 (1997). Because we determined above that there were no erroneous rulings that occurred during the trial, there is no evidence or reasonable inference for which the court should have granted the Halls' motion for a new trial.

Affirmed.

KURTZ, C.J., and BROWN, J., concur.

Review denied at 141 Wn.2d 1022 (2000).

---

"A hospital's officers and employees must exercise the degree of skill, care and learning expected of reasonably prudent officers and employees of hospitals in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in question. Failure to exercise such skill, care or learning is negligence."