FOURTH DIVISION

                  June 30, 2004

1-02-2012

STEPHEN GARLEY, as Special Adm'r    ) Appeal from the

of the Estate of Pauline Garley,   ) Circuit Court of

Deceased, and STEPHEN GARLEY, ) Cook County

Indiv.,       
 ) 

)
 

Plaintiff-Appellee,
 ) 

)

v. ) 

)

COLUMBIA LAGRANGE MEMORIAL HOSPITAL, ) 

) 

Defendant-Appellant ) 

)

(Scott Multack; Advanced Health Care   )

for Women. Ltd.; Carla Mitchell; Joan )

Cardone; Joseph Reda and Western       )

Springs Family Practice Center, Ltd., )     Honorable

) Richard B. Berland,

     Defendants). ) Judge Presiding.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Pauline Garley died from a pulmonary embolism three days after undergoing several abdominal surgeries at LaGrange Memorial Hospital (Hospital).  Her husband, plaintiff Stephen Garley, filed a wrongful death suit against
 the Hospital, based upon the conduct of its nursing staff in caring for Mrs. Garley both during and after surgery; numerous doctors involved in her surgery and postsurgical care, including Drs. Scott Multack, Carla Mitchell, Joan Cardone, and Joseph Reda; and two healthcare corporations.  Prior to trial, Drs. Cardone and Reda, as well as
 
the healthcare corporations, were voluntarily dismissed as defendants.  After a jury trial, the Hospital and Dr. Multack were found liable for Mrs. Garley's death.  The Hospital filed a motion for judgment 
n.o.v.
, which the circuit court denied.  On appeal, the Hospital argues that the circuit court erred in denying its motion for judgment 
n.o.v.
 because plaintiff's experts were not competent to testify as to the applicable nursing standard of care.  For the following reasons, we reverse and remand with instructions.

BACKGROUND

On the morning of April 28, 1998, Pauline Garley was admitted to the Hospital, where she was to undergo several abdominal surgeries lasting approximately three hours.  The surgeries were to be performed by Dr. Scott Multack, who was to be assisted by Dr. Carla Mitchell and Dr. Joan Cardone.  At 9:40 a.m., Nurse Nancy Nowak brought Mrs. Garley into the operating room and, pursuant to Dr. Multack's request, positioned her in the lithotomy position (on her back with her legs elevated and separated) with the use of knee crutches.  Though the length of the surgery, her weight, and her age placed Mrs. Garley at risk for developing a deep vein thrombus (DVT) or blood clot, no anticlotting device or medication was utilized or suggested during surgery.  After surgery was completed at 1:30 p.m., Dr. Multack ordered that Mrs. Garley be "ambulated with assistance" to decrease the risk that a DVT might develop.  According to hospital records, Nurse Karol Meier unsuccessfully attempted to walk Mrs. Garley at 4:36 p.m., approximately three hours after surgery.  Mrs. Garley was not ambulated on April 28.

At approximately 11 a.m., on April 29,
 Mrs. Garley was walked for the first time to a chair in her hospital room.  Later, at 2:17 p.m., she was walked an undisclosed distance with the use of a walker.  At 7:19 p.m., she was walked a distance of 0 to 10 feet, but could not tolerate any further ambulation.

On April 30
, at approximately 4 p.m., Mrs. Garley again ambulated from 0 to 10 feet.  At 8:33 p.m., while Nurse Linda Trotta was ambulating her, Mrs. Garley collapsed and died shortly thereafter. 

At trial, Dr. Mitra Kalelkar, a forensic pathologist and assistant medical examiner for Cook County, testified that Mrs. Garley died of a pulmonary embolism.  She testified that Mrs. Garley developed a DVT, which dislodged and traveled through her bloodstream, blocking her pulmonary arteries.  Based upon her finding that Mrs. Garley's left thigh and calf were larger than her right thigh and calf, she believed the DVT developed in her lower left extremity.  She could not determine, however, when the clot formed or whether the clot formed above or below her knee.  She also testified that she did not believe that the DVT formed in Mrs. Garley's pelvis because "no pelvic veins were thrombosed."

Dr. Carla Mitchell testified that she examined Mrs. Garley on April 29
, the day after the surgery, and that Mrs. Garley exhibited no symptoms of DVT.  Mrs. Garley also did not complain of leg pain during the examination.  Dr. Mitchell stated that, per Dr. Mutlack's order, the nurses were supposed to ambulate Mrs. Garley as soon as possible and, at a minimum, 3 times every 24 hours.  The nursing staff did not inform her that Mrs. Garley had not yet been ambulated.  Dr. Mitchell testified that had Mrs. Garley exhibited symptoms of DVT, there were methods and treatments available to reduce the risk of an embolism.   

Dr. Multack testified that he expected the nurses to ambulate Mrs. Garley a few hours after surgery, as soon as she was "up and alert."  He testified that she was to be walked "even if that meant waking her up" and that he expected her to walk unassisted by April 30.  When he saw Mrs. Garley on April 30
 at 5:10 p.m., she did not complain of leg pain.  He stated that he was never informed that Mrs. Garley had complained of leg pain or that she was having difficulty ambulating.  He testified that had she been ambulated in accordance with his order, the likelihood of a DVT forming would have decreased and that the failure to do so increased the risk of a pulmonary embolism.  He also testified that a number of treatment options were available had he been informed of Mrs. Garley's complaints of leg pain.

Nurse Karol Meier testified that she was working the 3 p.m. to 11 p.m. shift on April 28.
  She testified that she understood Dr. Multack's order to "ambulate with assist" to mean that Mrs. Garley was to be ambulated as soon as possible, but no later than 12 to 18 hours after surgery, 
i.e
. between 1:30 a.m. and 7:30 a.m. on April 29.  She testified that if a doctor's order is not being followed, unclear, or cannot be carried out, the doctor should be notified.  However, according to Mrs. Garley's chart, she was not exhibiting any symptoms consistent with the presence of a DVT and had not complained of leg pain.

Annette Colbert, a patient care technician, testified that she attended to Mrs. Garley on April 29 and 30.  She testified that Mrs. Garley complained of leg pain while she was being ambulated and that she (Ms. Cobert) relayed these complaints to Nurse Mary Kiser.  

Plaintiff testified that Ms. Colbert called him at work to tell him that his wife was sick, having trouble walking, and experiencing pain in her legs.  When plaintiff arrived at the hospital, his wife complained to him of leg pain.  Plaintiff did not remember which day Ms. Colbert called him.

Nurses Mary Kiser, Linda Trotta, Jane Shepski, and Shawndra Ferrell testified that they attended to Mrs. Garley during her three-day stay at the Hospital.  They testified that she did not exhibit any signs consistent with the presence of a DVT or complain to them about pain in her legs.  While hospital records indicated that Mrs. Garley complained of abdominal pain, there was no record of her complaining of pain in her legs.  Nurse Kiser also testified that she did not remember Ms. Colbert telling her that Mrs. Garley had complained of leg pain.

Three experts testified on behalf of plaintiff, none of whom were licensed nurses.  

Dr. Charles Bird, a board-certified obstetrician-gynecologist, had practiced medicine for 31 years after graduating from Northwestern University Medical School.  Dr. Bird was the chief of gynecology at Evanston Hospital and taught third-year medical students at his alma mater.

He testified that Mrs. Garley died as a result of a blood clot.  He characterized Mrs. Garley as having a moderate risk of developing such a clot based upon her age and weight and the length of the surgery.  Dr. Bird testified that, based upon his experience working with nurses, he was familiar with "the standard of care applicable to nurses who perform postoperative care on patients who have undergone surgeries" similar to those performed on Mrs. Garley.  He stated that, because no anticlotting measures were utilized during surgery, she should have been ambulated within 12 hours of surgery.  He testified that the Hospital nursing staff fell below the standard of care when they failed to ambulate Mrs. Garley in a timely fashion and that their failure to do so contributed to her death.  

During cross-examination, Dr. Bird stated that he had no opinion as to whether Mrs. Garley would have survived had she been ambulated, but testified on redirect examination that it was more probable than not that anticlotting devices or measures, including ambulation, would have prevented her death.  Dr. Bird also testified that the nurses should have followed up Mrs. Garley's complaints of leg pain to Ms. Colbert by examining her legs, but they were not required to inform her doctor of those complaints.

Dr. Fred Duboe, also an obstetrician-gynecologist, performed his residency at Northwestern after receiving his medical degree from the University of Illinois at Chicago (UIC) in 1980.  During his 22 years of continuous practice, Dr. Duboe published several scholarly articles relating to blood clots and taught both residents and nurses.  Dr. Duboe had also married a nurse and occasionally read her 
Nursing Spectrums
, a nursing periodical.  

He testified that Mrs. Garley died as a result of a DVT which developed some time after surgery.  He stated that, based upon his experience working with nurses, the nurses' conduct in caring for Mrs. Garley did not meet the requisite standard of care because they failed to appropriately and timely ambulate Mrs. Garley.  He testified that the nurses should have walked her a distance of about 60 feet within 12 to 18 hours after surgery.  Moreover, if the nurses were not able to ambulate her by that time, 
i.e
., by 7:30 a.m. on April 29, the nurses should have called her doctor for further instruction and advice.  He testified that the nurses' failure to ambulate Mrs. Garley in a timely fashion contributed to the formation of the blood clot which led to her death.  

Dr. Duboe testified that the nurses also failed to properly respond to Mrs. Garley's complaints of leg pain, which, he stated, should have been relayed to the doctors.  Dr. Duboe testified that the nurses' failure to properly respond to her complaints of leg pain hindered the possible diagnosis of a DVT, which also contributed to her death. 

Dr. Richard Vasquez, a general surgeon, graduated from UIC medical school in 1969.  After graduation, he worked as a general surgeon at Northwestern Memorial Hospital, published several articles, and taught residents in general surgery.  He stated that he also taught nurses and worked with "nursing vice-presidents" at Northwestern "in the formation of guides as to what nurses are supposed to do."  

He testified that Nurse Nowak's conduct before and during surgery fell below the applicable standard of care because she failed to suggest to Dr. Multack that he utilize anticlotting devices during surgery.  He testified that he did not know when the DVT formed, but that the failure to employ anticlotting devices "set the ball rolling toward [the development of a] DVT and pulmonary embolus."  

During cross-examination, Dr. Vazquez testified that Nurse Nowak could defer to Dr. Multack's request as to how Mrs. Garley was to be positioned for surgery.  He testified that, statistically speaking, the blood clot most likely developed in the veins of Mrs. Garley's pelvis.  He also testified that Mrs. Garley might have died even if she had been ambulated on April 28.  On redirect examination, Dr. Vazquez stated that it was more probable than not that Mrs. Garley would have survived had some anticlotting device been used during surgery.

Dr. James Schuler, a vascular surgeon, testified on behalf of the Hospital.  Dr. Schuler testified that he believed the blood clot formed in Mrs. Garley's pelvis during surgery.  Due to the location of the blood clot, Dr. Schuler testified that no amount of postsurgical ambulation would have prevented Mrs. Garley's death.  Dr. Schuler could not rule out the possibility that the blood clot formed in Mrs. Garley's legs, however, and HE stated that the lack of ambulation after surgery "probably contributed in a very small degree" to an expansion of the blood clot.  

Jacqueline Medland, a registered nurse, also testified on behalf of the Hospital.  Ms. Medland testified that she was employed as an administrator at Northwestern Memorial Hospital and that she taught postsurgical patient care to nurses.  She testified that Dr. Multack's order to ambulate with assistance required the nurses to walk Mrs. Garley as soon as she was able to tolerate it, but no later than 24 hours after surgery.  She testified that the nursing staff met the standard of care by walking Mrs. Garley to a chair in her room at approximately 11 a.m. on April 29.  She also testified that Mrs. Garley displayed no symptoms consistent with the presence of a DVT.

Based upon the testimony of plaintiff's experts, the jury was instructed on five theories as to how the Hospital's nursing staff negligently cared for Mrs. Garley:  (1) failing to ambulate her in an appropriate and timely manner; (2) failing to notify her physicians of her complaints of pain; (3) failing to notify her physicians of her lack of ambulation; (4)  failing to use Allen stirrups in positioning her for surgery; and (5) failing to suggest the use of anticlotting devices during surgery.  The jury returned a general verdict of liability against the Hospital and Dr. Multack. 

STANDARD OF REVIEW

"'[V]erdicts ought to be directed and judgments 
n.o.v.
 entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.'" 
Zabinsky v. Gelber Group, Inc.
, 347 Ill. App. 3d 243, 248 (2004), quoting
 Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967).  In ruling on a motion for a judgment notwithstanding the verdict, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather, it may only consider the evidence and any inferences therefrom, in the light most favorable to the party resisting the motion.  
Board of Trustees of Community College District No. 508 v. Coopers & Lybrand
, 208 Ill. 2d 259, 274, 208 Ill.2d 259 (2003).  A decision on a motion for judgment 
n.o.v.
 is subject to 
de novo
 review by this court.  
Snelson v. Kamm
, 204 Ill. 2d 1, 42, 787 N.E.2d 796 (2003), citing 
McClure v. Owens Corning Fiberglas Corp.
, 188 Ill. 2d 102, 132, 720 N.E.2d 242 (1999).

ANALYSIS

In a negligence medical malpractice action, the burden is on the plaintiff to prove the following: the proper standard of care against which the defendant's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the defendant's want of skill or care.  
Purtill v. Hess
, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867 (1986).  Unless the negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant's deviation from that standard.  
Purtill
, 111 Ill. 2d at 242.

The Hospital argues that, because none of plaintiff's expert physicians were licensed nurses, they were not competent to testify as to either the applicable standard of care for the nurses attending Mrs. Garley or whether the nursing staff deviated from that standard of care.  Plaintiff, on the other hand, contends that his experts were competent based upon their experience working with and, as to Drs. Duboe and Vasquez, teaching nurses.  

Recently, our supreme court addressed the issue of how courts are to determine the competency of an expert witness in a medical malpractice action.  See 
Sullivan v. Edward Hospital
, 209 Ill. 2d 100, 111-16 (2004).  In doing so, the court discussed the development of "the test of an expert physician's competency to testify."  
Sullivan
, 209 Ill. 2d at 112.

Initially, in 
Dolan v. Galluzzo
, 77 Ill. 2d 279, 285, 396 N.E.2d 13 (1979), the supreme court held: 

"[I]n order to testify as an expert on the standard of care in a given school of medicine, the witness must be licensed therein.  Once the fact of such license has been established, it lies within the sound discretion of the trial court to determine if the witness is qualified to testify as an expert regarding the standard of care."  
Dolan
, 77 Ill. 2d at 285. 

The rationale behind this licensure requirement, according to the court, was:

"'[T]here are different schools of medicine with varying tenets and practices, and that inequities would be occasioned by testing the care and skill of a practitioner of one school of medicine by the opinion of a practitioner of another school' [Citation]."  
Dolan
, 77 Ill. 2d at 283.

Simply put, the "practitioner of a particular school of medicine is entitled to have his conduct tested by the standards of his school."  
Dolan
, 77 Ill. 2d at 283. 

Dolan
's licensure requirement was next discussed in 
Purtill
, where the court stated:  

"It must be established that the expert is a licensed member of the school of medicine about which he proposes to express an opinion [citation], and the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community. [Citations.]  Once the former requirement has been satisfied, 'it lies within the sound discretion of the trial court to determine if the witness is qualified [and competent] to [state his opinion] as an expert regarding the standard of care. [Citation.]'"  
Purtill
, 111 Ill. 2d at 243.

In 
Jones v. O'Young, 
154 Ill. 2d 39, 43, 607 N.E.2d 224 (1992), the supreme court again addressed the competency requirements for expert witnesses in a medical malpractice action, stating:

"First, the physician must be a licensed member of the school of medicine about which he proposes to testify. [Citation.]  Second, 'the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community.' [Citation.]  Once the foundational requirements have been met, the trial court has the discretion to determine whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care."  
Jones
, 154 Ill. 2d 43.

The court went on to say:

"The foundational requirements provide the trial court with the information necessary to determine whether an expert has the expertise in dealing with the plaintiff's medical problem and treatment. ***

If the plaintiff fails to satisfy either of the foundational requirements of 
Purtill
, the trial court must disallow the expert's testimony. [Citation.]  The requirements are a threshold beneath which the plaintiff cannot fall without failing to sustain the allegations of his complaint."  
Jones
, 154 Ill. 2d at 43-44.

Having revisited its previous holdings in 
Dolan
, 
Purtill
, and 
Jones
, the court in 
Sullivan
 reiterated the requirement that, in order to provide competent standard of care testimony, the plaintiff's proffered expert physician must be licensed in the defendant's given school of medicine.  See 
Sullivan
, 209 Ill. 2d at 113-14.  ("If the expert physician fails to satisfy either of these foundational requirements, 'the trial court must disallow the expert's testimony. [Citation.] 
Dolan
 established the first requirement, 
i.e., 
that a health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify.  *** Accordingly, the 
Dolan 
court held that 'in order to testify as an expert on the standard of care in a given school of medicine, the witness must be licensed therein.' [Citation.]").   

The 
Sullivan
 court also rejected the plaintiff's argument 
that, based upon language in 
Jones
, "Illinois law no longer holds that a health professional expert witness must always be a licensed member of the school of medicine about which the expert proposes to testify."  
Sullivan
, 209 Ill. 2d at 114. The court stated:

"We cannot accept this argument.  
Jones
 clearly reaffirms this court's decision in 
Purtill
 describing 
two 
foundational requirements: that the health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify; and that the expert must be familiar with the methods, procedures, and treatments ordinarily observed by other health-care providers in either the defendant's community or a similar community.  Indeed, the very next sentences in 
Jones
 following the italicized sentence upon which plaintiff relies state: 'If the plaintiff fails to satisfy either of the foundational requirements of 
Purtill
, the trial court must disallow the expert's testimony. [Citation.].  The requirements are a threshold beneath which the plaintiff cannot fall without failing to sustain the allegations of his complaint.' [Citation.]  It is only 
after
 determining that both foundational requirements are satisfied that the court proceeds to evaluate whether the allegations of negligence concern matters within the expert's knowledge and observation.  Instead of retreating from the license requirement, 
Jones
 clearly reaffirms that a plaintiff must satisfy both requirements." (Emphasis in original.)  
Sullivan
, 209 Ill. 2d at 114-15, citing 
Jones
, 154 Ill. 2d at 44, citing 
Purtill
, 111 Ill. 2d at 244.  

Therefore, 
in order for an expert physician to be competent to testify, two foundational requirements must be met: (1) the physician must be a licensed member of the school of medicine about which he proposes to testify and (2) the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community.  See 
Sullivan
, 209 Ill. 2d at 112-13, quoting 
Jones
, 154 Ill. 2d at 43.  These foundational requirements are " 'a threshold beneath which the plaintiff cannot fall without failing to sustain the allegations of his complaint.' "  
Sullivan
, 209 Ill. 2d at 115,  quoting 
Jones
, 154 Ill. 2d at 44.  "Once the foundational requirements have been met, the trial court has the discretion to determine whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care." 
Jones
, 154 Ill. 2d at 43, citing 
Purtill
, 111 Ill. 2d at 243.  

It is undisputed that, in this case, plaintiff's experts were well-qualified physicians, whose professional experience and accomplishments were beyond reproach.  Equally undisputed, however, is that none of plaintiff's experts were licensed in the school of nursing.  The question is whether this one failing renders them incompetent to testify as to the applicable nursing standard of care and deviations therefrom.    

Both our supreme court and legislature have recognized nursing as a unique school of medicine.  See 
Sullivan
, 209 Ill. 2d at 119, citing 
Dolan
, 77 Ill. 2d at 284; see 
also 225 ILCS 65/5-1 
et seq.
 (West 2000) (the Nursing and Advanced Practice Nursing Act, which sets forth a unique licensing and regulatory scheme for the nursing profession).  In 
Sullivan
, our supreme court rejected the proposition that "'[t]here is nothing which a nurse can do which a doctor cannot do'" because it "presumes a universal standard of treatment among physicians and nurses." 
Sullivan
, 209 Ill. 2d at 120.  In doing so, the supreme court, quoting from the brief of 
amicus
 The American Association of Nurse Attorneys (TAANA), stated:

"TANNA persuasively reasons: 

'A physician, who is not a nurse, is no 

more qualified to offer expert, opinion testimony 

as to the standard of care for nurses than 

a nurse would be to offer an opinion as to 

the physician standard of care. *** Certainly, 

nurses are not permitted to offer expert testimony against a physician based on their observances of physicians or their familiarity with the procedures involved. An operating room nurse, who stands shoulder to shoulder with surgeons every day, would not be permitted to testify as to the standard of care of a surgeon. An endoscopy nurse would not be permitted to testify as to the standard of care of a gastroenterologist performing a Colonoscopy. A labor and delivery nurse would not be permitted to offer expert, opinion testimony as to the standard of care for an obstetrician or even a midwife. Nor would a nurse be permitted to testify that, in her experience, when she calls a physician, he/she usually responds in a certain manner. Such testimony would be, essentially, expert testimony as to the standard of medical care.'

S
cholars share this reasoning: 
 'Physicians often have no first-hand knowledge of nursing practice except for observations made in patient care settings. The physician rarely, if ever, teaches in a nursing program nor is a physician responsible for content in nursing texts. In many situations, a physician would not be familiar with the standard of care or with nursing policies and procedures which govern the standard of care. Therefore, a physician's opinions would not be admissible in jurisdictions which hold the expert must be familiar with the standard of care in order to testify as an expert.'" 
Sullivan
, 209 Ill. 2d at 120-21, quoting 
E. Beyer & P. Popp, 
Nursing Standard of Care in Medical Malpratice Litigation: The Rule of the Nurse Expert Witness
, 23 J. Health & Hosp. L. 363, 365 (1990).

The plaintiff argues that the testimony of Dr. Duboe and Dr. Vasquez clearly demonstrates that they did teach nurses and were familiar with the standard of care for nurses.  Appellee's argument on this point is well-taken.  However, the 
Sullivan
 court continued:

"By enacting the Nursing and Advanced Practice Nursing Act (225 ILCS 65/5-1 
et seq
. (West 2000)), the legislature has set forth a unique licensing and regulatory scheme for the nursing profession.  As TAANA observes, under the nursing act, a person with a medical degree, who is licensed to practice medicine, would not meet the qualification for licensure as a registered nurse, nor would that person be competent to sit for the nursing license examination, unless that person completed an accredited program in nursing. See 225 ILCS 65/5-1 
et seq
. (West 2000).  The appellate court in this case correctly reasoned:

'Dr. Barnhart is not a licensed member of the nursing profession.  To allow the doctor to testify as to the standard of care applicable to the nursing profession implicates the risks raised by 
Dolan
, namely, the imposition of a higher standard of care and the muddling and mixing of various tenets and practices unique to each profession.'  335 Ill. App. 3d at 272.  

We uphold the trial court's ruling on the competency of Dr. Barnhart to testify as to the standard of care for the nursing profession.  We expressly reaffirm the licensure requirement of 
Dolan
 and its progeny and decline plaintiff's invitation to deviate therefrom."  
Sullivan
, 209 Ill. 2d at 122-23. 

In this case, there is little question, based upon their extensive experience observing and working with, and, for Drs. Duboe and Vasquez, actually teaching nurses,
 that all three of plaintiff's expert physicians would have satisfied the second foundational requirement (being familiar with the methods, procedures, and treatments ordinarily observed by the nurses).  The fact remains, however, that none were licensed members of the school of nursing, an unequivocal requirement under 
Dolan
 and its progeny.  See 
Sullivan
, 209 Ill. 2d at 119 ("Clearly, this exact issue [whether the licensure requirement includes the nursing profession] was contemplated by this court in 
Dolan
, which unequivocally required that a health-care expert witness must be a licensed member of the school of medicine about which the expert testifies")
.  As our supreme court has made clear, "We expressly reaffirm the license 
requirement of 
Dolan
 and its progeny and decline plaintiff's invitation to deviate therefrom."  
Sullivan
, 209 Ill. 2d at 123, accord 
Jones
, 154 Ill. 2d at 43-44; 
Purtill
, 111 Ill. 2d at 244; 
Dolan
, 77 Ill. 2d at 285.    

Rigid and formalistic though this rule may be, it is fundamental to our judicial system that once our supreme court has declared the law on any point, this court must follow that law, as only the supreme court has authority to overrule or modify its own decisions.  See 
Mekertichian v. Mercedes-Benz U.S.A., L.L.C.
, 347 Ill. App. 3d 828, 836 (2004); 
Robinson v. Johnson
, 346 Ill. 2d 895, 907 (2003); see also 
Schiffner v. Motorola, Inc.
, 297 Ill. App. 3d 1099, 1102, 697 N.E.2d 868 (1998) (stating that "the doctrine of 
stare decisis
 requires courts to follow the decisions of higher courts").  Moreover, such a rule is necessary in order to avoid the danger of imposing upon nurses a higher standard of care than society and the law should expect, and the inequities that would result from doing so.  Therefore, because only those licensed in the field of nursing may testify as to the nursing standard of care and because plaintiff failed to offer any competent expert testimony to establish the standard of care for the Hospital's nursing staff, we find that the circuit court erred in denying the Hospital's motion for judgment notwithstanding the verdict.  See 
Sullivan
, 209 Ill. 2d at 123-24 (upholding the trial court's ruling that a doctor was not competent to testify as to the standard of care for the nursing profession and granting a directed verdict for the hospital). 

 Plaintiff relies upon 
Wingo v. Rockford Memorial Hospital
, 292 Ill. App. 3d 896, 904-07, 686 N.E.2d 722 (1997), to support his argument that his experts were competent to testify as to the applicable nursing standard of care.  In 
Wingo
, a pregnant patient went to the hospital reporting that her water had broken and that she was leaking fluid.  The doctor who examined the patient the following morning found that the patient was not leaking fluid.  After the doctor's examination, however, a nurse observed the patient leaking fluid, but failed to communicate this to the doctor.  The patient was discharged from the hospital later that night.  A few hours after her discharge, she began to have complications and returned to the hospital, where doctors performed an immediate delivery.  Her child was born with severe brain damage.  
Wingo
, 292 Ill. App. 3d at 900-01.  

At trial, the plaintiff introduced the testimony of expert witnesses, one of whom was a "board-certified obstetrician and gynecologist" who had taught nurses "in programs focusing on the assessment of a fetus during labor" and who "routinely lecture[d] obstetrical nurses in continuing education courses."  
Wingo
, 292 Ill. App. 3d at 903.  The experts each testified that the nurse deviated from the standard of care by not appropriately informing the doctor that the patient continued     to leak fluid.  After a jury returned a verdict for the plaintiff, the hospital appealed and argued that the "trial court erred in allowing the plaintiffs to present expert testimony from three doctors to establish the applicable standard of care for the Hospital's nurse."  
Wingo
, 292 Ill. App. 3d at 904.

After noting that no Illinois court had ever directly applied the licensing requirement to prevent a physician from establishing the applicable nursing standard of care, or found reversible error in allowing a physician to offer such testimony, the appellate court affirmed, stating:

"We find that the facts of the instant case do 

not fit within the license requirement of 
Dolan
 or 
Jones
.  Those cases indicate that the reason for the rule is to prevent a higher standard of care being imposed upon the defendant and to ensure that the testifying expert has expertise in dealing with the patient's medical problem and treatment and that the allegations of negligence are within the expert's knowledge and observation."  
Wingo
, 292 Ill. App. 3d at 906.

The court, in reviewing the facts before it, stated:

"Those concerns have not been sacrificed here.  In the instant case, the allegations of negligence against [the nurse] did not concern 
a nursing procedure but, rather, related to what a nurse is required to communicate to a physician about what transpired since the physician last saw the patient
.  As such the allegations of negligence do not concern an area of medicine about which there would be a different standard between physician and another school of medicine.  Furthermore, it was established that the allegations of negligence were well within the testifying doctors' knowledge and experience.  We believe that a physician should be entitled to testify about what he or she is entitled to rely upon in the area of communication from a nurse in the context of an obstetrical team rendering care to a patient in a hospital.  Accordingly, we hold that no error occurred in allowing the doctors to testify as to the applicable nursing standard of care in this case." (Emphasis added.) 
Wingo
, 292 Ill. App. 3d at 906.

The court also found that "even if it was error to admit the physicians' testimony under 
Dolan
, it was harmless" because "[t]hree nurses testified that the nursing standard of care required [the nurse] affirmatively tell [the doctor] that the patient continued to leak amniotic fluid."  
Wingo
, 292 Ill. App. 3d at 906.  The court stated "even without the physicians' testimony there was evidence in the record to establish the standard of care for nurses, and we do not find it likely that the outcome was affected by allowing the testimony."  
Wingo
, 292 Ill. App. 3d at 907
.  Plaintiff's reliance upon 
Wingo
 is misplaced. 

First, the initial premise on which 
Wingo
's reasoning was based, 
i.e
. that no Illinois court had directly applied the licensing requirement to prevent a physician from establishing the applicable nursing standard of care
, is no longer true.  See 
Sullivan
, 209 Ill. 2d at 123-24.  While the reach of the license requirement in the context of a physician testifying as to the nursing standard of care was an open question when 
Wingo
 was decided, as well as when the trial in this case was held, the supreme court in 
Sullivan
 left no doubt that having such a license is "unequivocally required." 
Sullivan
, 209 Ill. 2d at 123 ("We expressly reaffirm the licensure requirement of 
Dolan
 and its progeny and decline plaintiff's invitation to deviate therefrom").
  Second, in 
Wingo
, three nurses testified that the nurse deviated from the applicable nursing standard of care by failing to communicate the patient's condition to her doctor.  See 
Wingo
, 292 Ill. App. 3d at 906
.  Here, none of plaintiff's witnesses were competent to establish the applicable nursing standard of care.  Therefore, we believe that 
Wingo
 is not applicable to the case at bar. 

Plaintiff argues that his experts were competent to testify based upon their years of experience observing, working with, and teaching nurses.  While such experience would certainly demonstrate that they were 
"familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community," (
Purtill
, 111 Ill.2d at 243), the second foundational requirement for determining the competency of an expert witness
, and could be considered by the circuit court in determining, within her sound discretion, "whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care," (
Purtill
, 111 Ill.2d at 243), the fact remains that they were not licensed in the school of nursing.  An expert physician who is not licensed in the particular school of medicine about which he intends to testify is automatically incompetent; his knowledge, experience, and level of expertise, no matter how extensive, are simply irrelevant.  See 
Sullivan
, 209 Ill. 2d at 119; 
Jones
, 154 Ill. 2d at 43-44; 
Purtill
, 111 Ill. 2d at 244; 
Dolan
, 77 Ill. 2d at 285. 

Plaintiff also argues that the nursing staff's conduct was "so grossly negligent" that expert testimony was not needed to establish the Hospital's liability.  Plaintiff argues that the nursing staff basically "disregarded" Dr. Multack's order by failing to ambulate Mrs. Garley or inform her doctors of her inability to ambulate.  "An exception to the general rule that expert testimony is required in a medical malpractice case has been recognized in those cases where the conduct is so grossly negligent or the treatment so common that a layman may understand the conduct without the necessity of expert testimony to establish the standard of care and its breach."  
Prairie v. University of Chicago Hospitals
, 298 Ill. App. 3d 316, 321, 698 N.E.2d 611 (1998), citing 
Walski v. Tiesenga
, 72 Ill. 2d 249, 381 N.E.2d 279 (1978).

In this case, the defendant-nurses did not disregard Dr. Multack's order.  The nurses first attempted to ambulate Mrs. Garley three hours after surgery, but she was unable to tolerate it.  Mrs. Garley was walked three times on April 29.
  She was walked again on April 30.
  The nurses also testified that additional, "uncharted" attempts to ambulate her were unsuccessful.  Besides her complaints to Ms. Colbert and her husband of leg pain, complaints which were not indicated in any medical chart, Mrs. Garley showed no symptoms of a DVT.  Moreover, it is doubtful that the layman would understand the importance of ambulating a patient after surgery.  Thus, the nurses' conduct cannot be deemed so grossly negligent that plaintiff was not required to offer expert testimony to establish the Hospital's liability.

At the time of trial and until 
Sullivan
, no Illinois court had held that the license requirement in 
Dolan
 prevented a physician from establishing the applicable nursing standard of care and several appellate cases had affirmed circuit courts where physicians "testified against nurses to establish the nursing standard of care without it being challenged" (
Wingo
, 292 Ill. App. 3d at 905-06 (and cases cited therein)), and the t
rial court's error in allowing Drs. Bird, Duboe, and Vasquez's testimony was in reliance upon these cases.  However, based upon the clear dictate of our supreme court's holding in 
Sullivan
, we reverse and remand this matter for a new trial consistent with the views expressed herein.

Reversed and remanded.

GREIMAN, J., specially concurring.

HARTMAN, J., dissents. 

JUSTICE GREIMAN, specially concurring:

The authoring judge thoughtfully announces that he is following 
Sullivan v. Edward Hospital
, 209 Ill. 2d 100 (2004). In that case and its predecessors, 
Dolan v. Galluzzo
, 77 Ill. 2d 279 (1979), 
Purtill v. Hess
, 111 Ill. 2d 229 (1986), and 
Jones v. O'Young
, 154 Ill. 2d 39 (1992), a bright line was imposed which requires that health care experts be licensed in the school of medicine of which the expert proposes to testify.

In 
Wingo v. Rockford Memorial Hospital
, 292 Ill. App. 3d 896 (1997)
, the appellate court distinguished 
Dolan
 and its predecessors by suggesting a physician could testify to the standard of care for the nurses relating to communications to a physician about what has transpired since the physician last saw the patient.

The authoring judge suggests that 
Sullivan
 trumps all of the preceding decisions in imposing the bright line of licensure.

However, the 
Sullivan
 court is very careful to state "the precise factual scenario of 
Wingo
 is not present."  
Sullivan
, 209 Ill. 2d at 118.  In 
Sullivan
, the expert's testimony related to nursing procedures rather than communications.  
Sullivan
, 209 Ill. 2d at 118.

Sullivan
 further states:

"In distinguishing 
Wingo
 from this case, the

appellate court did not discuss the merits of

Wingo
, and neither do we.  The present case

falls squarely within the license requirement

of 
Dolan
 and its progeny."  
Sullivan
, 209 Ill.

2d at 119.

If our supreme court wished to impose a license requirement even on those matters that relate to communications to a physician from a nurse, it could have easily so stated.

Instead it suggested the facts of 
Wingo
, dealing with communications between a nurse and a physician, were not within the purview of the order in 
Sullivan
.

Accordingly, we must conclude that 
Wingo
 remains an appropriate precedent to follow in the case at bar if it meets the factual requirements.  The negligence of the nurse in part is predicated upon the nurse's failure to communicate to the physician the failure of the plaintiff's decedent to respond to ambulation.

While a physician unlicensed as a nurse might not be competent to testify as to general nursing procedure, nothing in 
Sullivan
 suggests that a physician, upon a proper foundation of experience, could not testify as to the standard of care for a failure of communication between nurse and physician.

In the case at bar, Dr. DuBoe's opinion does touch upon the failure to communicate, although he also touches upon the failure to timely ambulate the patient and to properly respond to the 

patient's complaints of pain.  Similarly, Drs. Bird and Vasquez testified to matters other than communication between nurse and

physician.  Accordingly, it appears that their testimony here falls within the scope of 
Sullivan
.

I therefore grudgingly concur with the authoring judge.  Grudgingly because I do not believe that a physician's testimony about a nurse's standard of care will somehow raise the bar on that standard of care.  It is difficult to imagine that physicians with 20 years' (Dr. DuBoe), 31 years' (Dr. Bird) and 26 years' (Dr. Vasquez) experience, two of whom have taught nurses and one who has written a nurses manual, cannot determine a nurse's standard of care.

The majority quotes a learned text that is set forth in 
Sullivan
:  
E. Beyer & P. Popp,  
Nursing Standard of Care in Medical Malpratice Litigation: The Role of the Nurse Expert Witness
, 23 J. Health & Hospital L. 363, 365 (1990), which provides:

"'Physicians often have no first-hand knowledge

of nursing practice except for observations made

in patient care settings.  
The physician rarely,

if ever, teaches in a nursing program nor is a

physician responsible for content in nursing

texts
.'"
 
(Emphasis added.)  Slip op. at 18.   

One might wonder why the supreme court in 
Sullivan
 felt it 

necessary to make reference to the physician who teaches in nursing programs or who is responsible for the production of 

nursing texts.

In the instant matter, Dr. Bird testified that he had taught 

nurses and Dr. Vasquez testified that, in addition to teaching nurses, he had worked with hospital authorities to prepare nursing guidelines.

The foundation that these doctors taught or prepared manuals was not in much depth or detail.  While this may not be the case for a physician who has been involved in teaching or preparation of a nursing manual to testify, 
Sullivan
 does not completely close that door.

JUSTICE HARTMAN dissents:

I  respectfully dissent from the majority disposition reversing the jury's decision favoring plaintiffs in this case.

The majority author finds that 
Sullivan v. Edward Hospital
, 209 Ill. 2d 100, 806 N.E.2d 645 (2004) (
Sullivan
), has established a "bright line" requiring, for this case, that a physician may not testify with respect to the nursing standard of care unless the physician also was a licensed nurse.  The concurring author disagrees, citing 
Wingo v. Rockford Memorial Hospital,
 292 Ill. App. 3d 896, 686 N.E.2d 722 (1997) (
Wingo
), to the effect that 
Sullivan
 never reached the issue of whether a communication between doctor and nurse, or its absence, could be the subject of the physician's expert opinion as to the nurse's failure to meet the standard of care required in such cases.  I agree with the concurring opinion with respect to its conclusion that 
Sullivan
 does not prevent a doctor from testifying as to a nurse's failure to communicate to the doctor necessary information concerning fulfillment of the doctor's orders as it affects his patient.

The concurrence goes on to note, however, that the three physicians who testified for plaintiffs did not limit their expert testimony to lack of communication, but also testified to nursing matters other than communications, or lack thereof, contrary to 
Sullivan
, and would concur in the reversal and remandment of this case.  Although the concurrence notes that two of the three physicians taught in nursing programs, one of whom assisted in the preparation of a nursing manual, the foundations for their teaching and writing "was not in much depth or detail." 

Clearly, plaintiffs' physicians who testified as experts as to adequacies of communications between doctors and nurses concerning the patient's well-being were qualified to give their expert opinions with respect to this subject.  The three doctors had over 76 years of experience in working with nurses in various hospital settings and were well qualified to testify concerning what was expected of nurses by way of communications between doctors and nurses.  It is unfathomable to regard a doctor who has had to rely on hospital staff to advise him as to the progress, or lack of progress, of a patient he has placed in the hospital for care and treatment, as incompetent to testify as an expert in this regard.

With respect to the physicians' qualifications to testify concerning nursing matters other than communications, dismissed by the concurrence for lack of foundation, no objections to their testimony were timely made at a time when any paucity of foundation could have been cured at the trial level.  Doctors who teach or train nurses at nursing schools have been recognized in other jurisdictions as experts with respect to nursing standards of care violations.  
Nold v. Binyon
, 272 Kan. 87, 31 P.3d 274 (2001); 
 
Hall v. Sacred Heart Medical Center
, 100 Wash. App. 53, 995 P.2d 621 (2000); 
Hall v. Huff
, 957 S.W.2d 90 (Tex. App. 1997); 
Haney v. Alexander
, 71 N.C. App. 731, 323 S.E.2d 430 (1984).  None of the foregoing authorities have questioned the teaching or training experiences of the physicians testifying as to nursing standards.  In 
Wingo
, similarly to the instant case, a board certified obstetrician and gynecologist, who lectured nurses in various programs and courses, was found qualified to testify with respect to deviations in nursing standards of care. There, as here, defendant's failure to make a contemporaneous objection at trial was found to be waiver, although the appellate court went on to decide the issue on its merits favorably to plaintiffs.

For the foregoing reasons, I would affirm the jury's decision in the present case.