THIRD DIVISION
May 30, 2007

Nos. 1-06-1007 and 1-06-1809 Consolidated

| | | |
|---|---|---|
| JANE PETRE, Special Administrator of the Estate of James Petre, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| CARDIOVASCULAR CONSULTANTS, S.C., d/b/a Cardiovascular Medical Associates, S.C., | ) ) ) ) | |
| | ) | No. 02 L 14506 |
| Defendant-Appellant | ) ) | |
| (Vincent A. Kucich, Robert E. Applebaum, Hershel L. Wix, David Looyenga, Robert Prentice, George Gustafson, Hickory Cardiology Associates, Ltd., and SSN Health Care Corporation, d/b/a St. Francis Hospital and Health Center, a Not-for-Profit Corporation, | ) ) ) ) ) ) ) | Honorable |
| | ) | Barbara A. McDonald, |
| Defendants). | ) | Judge Presiding. |

PRESIDING JUSTICE THEIS delivered the opinion of the court:

This is the third time that this case has come before the appellate court. Plaintiff Jane

Petre (plaintiff), the special administrator of the estate of James Petre (Petre), filed this medical

malpractice action against defendants Cardiovascular Consultants, S.C., d/b/a Cardiovascular

Medical Associates, S.C. (CMA), Dr. Vincent A. Kucich, Dr. Robert E. Applebaum, Dr. Hershel

L. Wix, Dr. David Looyenga, Dr. Robert Prentice, Dr. George Gustafson, Hickory Cardiology

Associates, Ltd., and St. Francis Hospital and Health Center. Plaintiff sought recovery for injuries

sustained by Petre following coronary artery bypass surgery performed by Dr. Kucich at St. Francis Hospital and Health Center in Blue Island, Illinois. After the surgery, Petre developed a postoperative wound infection, which ultimately led to the removal of Petre's sternum. Prior to the first trial in 2000, plaintiff entered into a settlement with St. Francis Hospital and voluntarily dismissed Dr. Applebaum, Dr. Looyenga, Dr. Prentice, Dr. Gustafson, and Dr. Wix from the case.

Following a third trial, the jury returned a verdict in favor of Dr. Kucich but against CMA, and awarded plaintiff $814,443.97. CMA now appeals, contending that: (1) the trial court abused its discretion in striking portions of CMA's reply in support of its posttrial motion and all of CMA's arguments should be considered by this court on appeal; (2) it is entitled to a judgment notwithstanding the verdict because plaintiff failed to establish a *prima facie* case of negligence against any non-physician employee or agent of CMA; (3) it is entitled to a judgment notwithstanding the verdict because the jury's verdict is not supported by the evidence and because plaintiff failed to present any affirmative evidence of negligence; (4) it is entitled to a new trial because the trial court erred in permitting plaintiff to go beyond the scope of defendants' examination of Dr. Kucich in defendants' case-in-chief to present defendants' theory of liability; and (5) the jury's verdict is against the manifest weight of the evidence. For the following reasons, we reverse the trial court's judgment and remand for a fourth trial.

The record discloses the following facts and procedural history relevant to this appeal. In their second amended complaint, plaintiff alleged the following general facts. Plaintiff was admitted to St. Francis Hospital on November 18, 1996. Several days later, on November 26, 1996, Dr. Kucich, who was a member of the CMA practice, performed coronary artery bypass

surgery on Petre. While he was under the care of Dr. Kucich and CMA, Petre developed a bacterial infection. Nevertheless, Petre was discharged from St. Francis Hospital on December 2, 1996. Ultimately, in January 1997, Petre underwent a second surgery to correct and cure the infection.

Plaintiff raised 19 counts against all of the defendants involved, two of which were against CMA. In count I, plaintiff raised a medical malpractice claim against CMA based on a theory of vicarious liability. Plaintiff alleged that CMA, "acting by and through its agents, employees, and medical staff, including but not limited to [Dr.] Kucich and [Dr.] Applebaum or others," committed medical malpractice by:

"(a) Carelessly and negligently failing to provide appropriate antibiotic prophylaxis for the cardiac surgery performed of [*sic*] James Petre;

(b) Carelessly and negligently prescribed and utilized excessive and unnecessary amounts of corticosteroids which predispose to infection;

(c) Carelessly and negligently failed to recognize a sternal wound infection prior to the discharge of James Petre from St. Francis Hospital and Health Center on December 2, 1996;

(d) Carelessly and negligently failed to respond appropriately to cultures which identified the sternal wound infection; and

(e) Carelessly and negligently failed to provide responsible surgical follow-up after discharge on December 2, 1996."

As a result, plaintiff alleged that Petre suffered great pain and mental anguish, disability, and

disfigurement, which rendered him unable to pursue his occupation and resulting in loss of income. In count XI, plaintiff alleged that as a result of Petre's injury, plaintiff was deprived of Petre's companionship, valuable services, and normal family relations. Dr. Kucich and CMA filed an answer denying misconduct.

The case was tried for the first time in 2000. As noted above, prior to that trial, plaintiff settled with St. Francis Hospital and voluntarily dismissed Dr. Applebaum, Dr. Looyenga, Dr. Prentice, Dr. Gustafson, and Dr. Wix from the case. The jury returned a verdict in favor of plaintiff in the amount of $465,000 against Dr. Kucich and CMA. Defendants appealed, and this court reversed, holding that the trial court "erred as a matter of law both in precluding evidence of the dismissed Hickory physicians' conduct and in refusing to give the appropriate jury instruction, thereby denying defendants a fair trial." Petre v. Kucich, 331 Ill. App. 3d 935, 938, 771 N.E.2d 1084, 1087 (2002). We then remanded the case for a second trial.

The second trial occurred in 2003. In that instance, the jury returned a verdict in favor of Dr. Kucich and CMA. Plaintiff appealed, and this court reversed, holding that the trial court was required to give the long-form jury instruction on sole proximate cause to explain to the jury the impact of the evidence of third-party negligence on defendants' negligence. Petre v. Kucich, 356 Ill. App. 3d 57, 66, 824 N.E.2d 1117, 1124 (2005). We thus remanded the case again.

The case then proceeded to trial in 2005. However, because two of plaintiff's witnesses were unavailable, the court declared a mistrial.

The case was subsequently tried for the third time, and that trial is the subject of this appeal. At that trial, plaintiff and Petre's younger sister, Diane Prindle, testified that Petre

4

suffered a heart attack on November 18, 1996. Eight days later, Petre underwent coronary artery bypass surgery. Petre was subsequently discharged from the hospital on December 2, 1996.

Roughly a month later, on December 31, 1996, plaintiff removed Petre's bandages to clean his wound and discovered a yellow blister larger than a quarter. Several days later, they learned that Petre had a severe infection. A plastic surgeon subsequently removed Petre's sternum and performed reconstructive surgery of the area using Petre's pectoralis muscles. Petre ultimately died in December 2000 of unrelated liver cancer.

Plaintiff offered the testimony of two expert physicians. An infectious disease expert opined that Petre suffered from a likely sternal osteomyelitis, or an infection of the sternum bone, which was due to a methicillin-resistant staphylococcus epidermidis (MRSE) infection that seeded at the time of Petre's bypass surgery. A cardiothoracic surgery expert opined that Petre should have been prophylactically administered an antibiotic called Vancomycin, which is effective against methicillin-resistant bacteria.

Plaintiff also examined defendant Dr. Vincent Kucich as an adverse witness. Dr. Kucich testified that he was a cardiothoracic surgeon and performed Petre's bypass surgery and explained the procedure and care. In particular, care for Petre's surgical wound was done according to a protocol. Dr. Kucich would also check Petre's wound daily. On December 2, 1996, Petre had a small amount of serous, or clear, fluid draining from his surgical wound. Dr. Kucich explained that clear fluid drainage is common and usually not a sign of infection. If there were no other signs of infection, such as fever, redness, or tenderness, Dr. Kucich would not do anything further. Depending on the nature of the fluid, Dr. Kucich would obtain a culture on it.

Plaintiff's counsel then confronted Dr. Kucich with the testimony he gave at his deposition in 1999. At that time, Dr. Kucich stated that serous fluid drainage "would be cultured routinely." He further stated that if he saw such drainage, he would order a culture. He admitted in his deposition that he followed this procedure with Petre and ordered the culture just prior to Petre's discharge. However, in his testimony at trial, Dr. Kucich questioned whether he had done so, observing that if he had ordered a culture of Petre's surgical wound drainage, Petre's medical chart would have contained a notation that he ordered a culture, and the medical chart contained no such order. He also stated that he did not remember giving the order for the culture or directing that a nurse do it. He added that often, nurses will order a culture on their own and tell the doctor later. He did not explain when a nurse would order a culture or when a doctor would or when the nurse would tell the doctor of the results.

Nevertheless, Dr. Kucich admitted that somebody obtained a culture of Petre's surgical wound drainage. However, whether Dr. Kucich was the individual to follow up on the culture would have "depended on the circumstances." Dr. Kucich did not elaborate on these "circumstances." He did state that he did not personally check every culture because there are so many taken. Generally, he would only follow up if the drainage was purulent or if the patient had other symptoms of infection.

The culture in this case was positive for MRSE. However, Dr. Kucich did not learn this until sometime before his deposition in 1999. Had he known, he would have followed up with Petre. Rather, Dr. Wix, Petre's cardiologist in Kankakee, had the responsibility to follow up on the culture. This was because Petre chose not to continue his care in Blue Island. A note in

Petre's medical record, which was admitted into evidence, confirms that Petre would continue his care with Dr. Wix in Kankakee due to the distance. It further indicated that Petre would call CMA's office if he had any problems. The note was written by one of CMA's secretaries.

The individuals on Dr. Kucich's staff who would have checked on the culture result were Marilyn Kamak, physician's assistant Ian Timms, or nurse Sue Wesensten. However, none of them checked the result. Dr. Kucich never explained how or when any of these individuals would notify him of a culture result.

Petre was discharged from St. Francis Hospital on December 2, 1996. CMA sent a letter to Dr. Wix confirming that Petre would continue his postoperative care with Dr. Wix. Subsequently, Dr. Kucich learned that Petre suffered from an MRSE infection, which resulted in the surgical removal of Petre's sternum by another doctor.

After plaintiff rested, defendants read the evidence deposition of Dr. Hershel Wix, Petre's cardiologist, into the record. Dr. Wix began treating Petre after his heart attack. He also treated Petre following his discharge from the hospital. He saw Petre on December 6, 1996, and he seemed "quite stable" at that time. Dr. Wix saw Petre again on December 10, 1996. At that time, he noted that Petre's surgical wound was still draining and that in some small areas, the drainage was causing "mild breakdown," or deterioration, of the skin around the incision. These findings were not atypical. However, Dr. Wix saw Petre again on December 13 and 20, 1996, and he appeared normal on those dates. Dr. Wix saw Petre again on January 3, 1997, and at that time, his surgical wound showed two areas of deterioration. Dr. Wix then suspected an infection and referred Petre to Dr. David Dreyfuss, a plastic surgeon, for further care.

1-06-1007 & 1-06-1809 cons.

Defendants then read the evidence deposition of plaintiff's infectious disease expert into the record. In that testimony, that doctor opined that prophylactic use of Vancomycin would have caused an increased risk of a sternal wound infection. A cardiothoracic surgeon also testified as an expert for the defense. He opined that it would not have been proper to administer Vancomycin to Petre prior to his surgery and concluded that Dr. Kucich complied with the standard of care in caring for Petre.

Defendants then called Dr. Kucich to testify for the second time. He testified again about the bypass surgery and what steps he took to guard against infection. He also added that he did not see Petre after he was discharged from the hospital on December 2, 1996. Referring to Petre's medical chart, Dr. Kucich cited the note by his secretary that Petre would continue his care with Dr. Wix in Kankakee due to the distance.

On cross-examination, Dr. Kucich admitted that "whether or not [he] ordered [a culture] or [he] knew about it, [he] knew that there was a culture taken on December 2, 1996." He also reiterated that he noticed serous drainage from the surgical wound for the first time on December 2, 1996, but that such drainage was very common and not considered a complication. Dr. Kucich then admitted that sometimes culture results were not always delivered to the person to whom they were addressed. Accordingly, if a culture was ordered by his team personally, and not the hospital, then his team would follow up on it. However, they would not follow up on it unless his team's name was on the report.

Dr. Kucich also admitted that "we always get cultures on every fluid," and that a culture was taken on Petre according to "standard procedure." Plaintiff's counsel then asked Dr. Kucich

8

whether it would be a breach of the standard of care if someone in his office knew about the culture result but did nothing. Plaintiff's counsel did not specify whether he was referring to the standard of care for a cardiothoracic surgeon or to some other standard of care.

Plaintiff's counsel then confronted Dr. Kucich with his deposition testimony. At that time, when asked whether he attempted to obtain and look at the culture report within a week of it being ordered, Dr. Kucich responded that he personally did not, but someone on his staff may have. When asked if he knew "for sure" whether anyone did, Dr. Kucich responded that "[s]omebody obviously did because the result was noted."

Based on his deposition, Dr. Kucich then testified at trial that he did not know about the culture result at the time, but only learned of it afterward. However, he admitted that "[i]f my office knew and didn't tell someone, then yeah, there's a breach of standard of care." He also admitted that CMA, his office, was also a defendant in the case and that nurse Sue Wesensten was working under his direction.

On redirect examination, Dr. Kucich examined Petre's medical records. An entry dated January 8, 1997, indicated that a culture was done on January 3, 1997, which had been ordered by Dr. Wix. The notes contain no entry from the week of December 2, 1996. Dr. Kucich added that his deposition testimony did not mention when CMA received the results of the culture report from December 2, 1996. Other than Dr. Kucich's secretary's note from December 4, 1996, which indicated that Petre would continue his care with Dr. Wix in Kankakee due to the distance, and the CMA letter from December 9, 1996, which confirmed that Petre would continue his care with Dr. Wix, there are no notations from December 1996 in Petre's medical record.

9

1-06-1007 & 1-06-1809 cons.

Following closing arguments, the jury was given various instructions. The only instruction given to the jury on how to determine the standard of care pertained to a medical doctor. That instruction provided:

"A medical doctor who holds himself out as a specialist and provides service in his specialty must possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well qualified specialist under circumstances similar to those shown by the evidence. A failure to do so is professional negligence.

The only way in which you may decide whether a Defendant possessed and applied the knowledge and used the skill and care which the law required of him is from expert testimony presented in the trial.

You must not attempt to determine this question from any personal knowledge you have."

This instruction is based on the Illinois Pattern Jury Instruction for professional negligence. Illinois Pattern Jury Intructions, Civil, No. 105.01 (2006) (hereinafter IPI). The jury was not given any specific instructions on standard of care for any other type of medical personnel. However, the jury was given an instruction on vicarious liability, which provided that CMA was a corporation and could only act through its officers and employees. The vicarious liability instruction further provided that Dr. Kucich "was the agent" of CMA; therefore, any act or omission of Dr. Kucich was an act or omission of CMA. The instruction did not refer to any other employees of CMA.

10

1-06-1007 & 1-06-1809 cons.

The jury ultimately returned a verdict in favor of plaintiff against CMA in the amount of $814,443.97 and in favor of Dr. Kucich. CMA then filed a timely posttrial motion raising three issues. First, CMA argued that plaintiff failed to establish a *prima facie* case of negligence because there was no evidence of any breach or that such a breach proximately caused Petre's injury. Second, CMA argued that it was entitled to a new trial because the trial court abused its discretion in permitting plaintiff to cross-examine Dr. Kucich using his deposition testimony. Third, CMA argued that the jury's verdict was against the manifest weight of the evidence.

In response, plaintiff asserted, *inter alia*, that it had established all of the elements of its *prima facie* case of negligence against CMA. Regarding the first element, duty or standard of care, plaintiff cited Dr. Kucich's testimony on cross-examination where he admitted that if someone in his office knew of the result of the December 2, 1996 culture and did nothing, then that would be a breach of the standard of care.

In reply, CMA asserted for the first time that plaintiff could not rely on the testimony of Dr. Kucich from his cross-examination during defendants' case-in-chief as evidence of the standard of care. Thereafter, plaintiff filed a motion to strike the portions of CMA's posttrial motion which raised these objections to Dr. Kucich's testimony with respect to the duty element of negligence for the first time arguing that these arguments had been waived. Following a hearing, the trial court agreed and struck those sections from CMA's reply in support of its posttrial motion.

Ultimately, the court denied CMA's posttrial motion on April 3, 2006. CMA filed a notice of appeal on April 7, 2006. However, plaintiff subsequently filed a motion for Rule 137

11

1-06-1007 & 1-06-1809 cons.

(134 Ill. 2d R. 137) sanctions on May 3, 2006. The court denied plaintiff's motion for Rule 137 sanctions on June 23, 2006, and CMA filed a new notice of appeal on June 26, 2006.

All of the issues that CMA raises in this appeal turn on whether it was appropriate for plaintiff to rely on Dr. Kucich's testimony on cross-examination during defendants' case-in-chief to establish the elements of plaintiff's *prima facie* case of negligence against CMA. In this regard, CMA contends that the trial court erred in denying its motion for judgment notwithstanding the verdict because plaintiff failed to establish a *prima facie* case of negligence against it. CMA specifically claims that Dr. Kucich's response to a hypothetical question on cross-examination was insufficient evidence of the standard of care for a non-physician employee of CMA. CMA also claims that the jury's verdict was against the manifest weight of the evidence for similar reasons.

However, we must initially address whether CMA waived this issue by failing to raise it prior to its reply in support of its posttrial motion, at which point the trial court struck the argument for failure to raise it sooner. It is well-settled that an issue is waived on appeal unless a party makes an objection at the time of a purported error and specifically raises the issue in a written posttrial motion. Kapsouris v. Rivera, 319 Ill. App. 3d 844, 848, 747 N.E.2d 427, 431 (2001).

Here, because CMA failed to object to the cross-examination of Dr. Kucich on these grounds until its reply brief in support of its posttrial motion, the issue is waived. Kapsouris, 319 Ill. App. 3d at 848, 747 N.E.2d at 431. Nevertheless, because waiver is a limitation on the parties, and not on the court, we may consider an issue not raised in the trial court if the issue is one of law and is fully briefed by the parties. Committee for Educational Rights v. Edgar, 174 Ill.

12

1-06-1007 & 1-06-1809 cons.

2d 1, 11, 672 N.E.2d 1178, 1183 (1996). Based on this principle, and because we find, for the reasons that follow, that the trial court erred in denying CMA's motion for judgment notwithstanding the verdict, we decline to apply waiver.

A motion for judgment notwithstanding the verdict should be granted only when " 'all of the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand.' " York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147, 178, 854 N.E.2d 635, 652 (2006), quoting Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). Put another way, "a motion for judgment [notwithstanding the verdict] presents 'a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case.' " York, 222 Ill. 2d at 178, 854 N.E.2d at 652, quoting Merlo v. Public Service Co., 381 Ill. 300, 311, 45 N.E.2d 665, 672 (1942). We review a trial court's decision to deny a motion for judgment notwithstanding the verdict *de novo*. York, 222 Ill. 2d at 178, 854 N.E.2d 652. When the trial court has erroneously denied a motion for judgment notwithstanding the verdict, we will reverse the verdict without a remand. See Maple v. Gustafson, 151 Ill. 2d 445, 453, 603 N.E.2d 508, 512 (1992).

Our supreme court has articulated a different standard for the granting of a new trial because the evidentiary situation that would require a new trial differs from a situation that would justify the entry of a judgment notwithstanding the verdict. Maple, 151 Ill. 2d at 453, 603 N.E.2d at 512. A motion for a new trial should be granted where the jury's verdict is against the manifest

13

weight of the evidence. Maple, 151 Ill. 2d at 454, 603 N.E.2d at 512. A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based on any of the evidence. Maple, 151 Ill. 2d at 454, 603 N.E.2d at 512-13. Because the decision whether to grant a new trial is a matter of the trial court's discretion, we will not reverse its ruling on such a motion absent an abuse of that discretion. Maple, 151 Ill. 2d at 455, 603 N.E.2d at 513.

In a negligence medical malpractice case, a plaintiff must prove: (1) the proper standard of care against which the defendant's conduct is measured; (2) an unskilled or negligent failure to comply with the applicable standard; and (3) a resulting injury proximately caused by the defendants want of skill or care. Sullivan v. Edward Hospital, 209 Ill. 2d 100, 112, 806 N.E.2d 645, 653 (2004). Unless the negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care. Garley v. Columbia LaGrange Memorial Hospital, 351 Ill. App. 3d 398, 404-05, 813 N.E.2d 1030, 1036 (2004).

Here, plaintiff's theory of negligence is based on what Dr. Kucich's staff, a nurse or otherwise, should have communicated to him. This type of negligence is not the type of negligence that would be so grossly apparent that it would "speak for itself," nor could a layperson be expected to know what a doctor would have expected his nurse to have communicated to him and when. Therefore, we find that expert testimony was required to establish the standard of care in this case. See, e.g., Wingo v. Rockford Memorial Hospital, 292 Ill. App. 3d 896, 904, 686 N.E.2d 722, 728 (1997) (using expert testimony to determine the

1-06-1007 & 1-06-1809 cons.

standard of care pertinent to communications between a physician and a nurse).

The supreme court in Purtill v. Hess, 111 Ill. 2d 229, 489 N.E.2d 867 (1986), articulated a three-step process for determining whether an expert is competent to testify regarding the standard of care in a particular case. Alm v. Loyola University Medical Center, No. 1-06-0067, slip op. at 5 (April 20, 2007). Initially, plaintiff's proffered expert must satisfy two foundational requirements. Alm, No. 1-06-0067, slip op. at 5. First, the expert must be licensed in the defendant's given school of medicine. Sullivan, 209 Ill. 2d at 112-13, 806 N.E.2d at 654; Garley, 351 Ill. App. 3d at 406, 813 N.E.2d at 1037. Second, the proffered expert must also show that he is familiar with the methods, procedures and treatments ordinarily observed by others in the defendant's community or a similar community. Sullivan, 209 Ill. 2d at 112-113, 806 N.E.2d at 654; Garley, 351 Ill. App. 3d at 407, 813 N.E.2d at 1038. If the proffered expert fails to satisfy either of these two foundational requirements, the inquiry ends there, and " 'the trial court must disallow the expert's testimony.' " Sullivan, 209 Ill. 2d at 113, 806 N.E.2d at 654, quoting Jones v. O'Young, 154 Ill. 2d 39, 44, 607 N.E.2d 224, 226 (1992); see also Alm, No. 1-06-0067, slip op. at 6. If the proffered expert satisfies the two foundational requirements, the analysis proceeds to the third step, in which the trial court exercises its discretion to determine if the proffered expert is competent to testify in the particular case before the court. Alm, No. 1-06-0067, slip op. at 6.

Regarding the first of the two Purtill foundational requirements, both the supreme court and the legislature have recognized nursing as unique school of medicine. Garley, 351 Ill. App. 3d at 407, 813 N.E.2d at 1038. In addition, a defendant is entitled to have his conduct tested by

15

1-06-1007 & 1-06-1809 cons.

the standards of his own school of medicine; otherwise, a higher standard of care could be unfairly imposed on a defendant who does not belong to the same school of medicine as the proffered expert. Sullivan, 209 Ill. 2d at 113, 806 N.E.2d at 654 (discussing Dolan v. Galluzzo, 77 Ill. 2d 279, 396 N.E.2d 13 (1979)). Thus, the supreme court held in Sullivan that a physician cannot testify to the standard of care for nursing procedures. Sullivan, 209 Ill. 2d at 119, 806 N.E.2d at 657. However, the supreme court recognized a limited exception to the licensing requirement, which was first articulated in Wingo v. Rockford Memorial Hospital, 292 Ill. App. 3d 896, 686 N.E.2d 722 (1997). See Sullivan, 209 Ill. 2d at 118-119, 806 N.E.2d at 657 (distinguishing Wingo, 292 Ill. App. 3d at 906, 686 N.E.2d at 729).

In Wingo, this court held that where the allegations of negligence do not concern a nursing procedure but, rather, relate to what a nurse is required to communicate to a physician, the licensing requirement of the Purtill test does not apply. Wingo, 292 Ill. App. 3d at 906, 686 N.E.2d at 729. This is because the problem of imposing a higher standard of care on a defendant is not present where there is no different standard between the proffered expert's school of medicine and the school of medicine to which the defendant belongs. Wingo, 292 Ill. App. 3d at 906, 686 N.E.2d at 729.

Moreover, as the Wingo court recognized, "[w]hether the expert is qualified to testify is not dependent on whether he is a member of the same specialty or subspecialty as the defendant but, rather, whether the allegations of negligence concern matters within his knowledge and observation." Jones, 154 Ill. 2d at 43, 607 N.E.2d at 226. Thus, in Wingo, although the proffered experts, obstetricians, were not licensed nurses, it "was established that the allegations

16

of negligence were well within the testifying doctors' knowledge and experience." Wingo, 292 Ill. App. 3d at 906, 686 N.E.2d at 729. The testifying obstetricians in Wingo established that they knew what an obstetric nurse should have communicated to an obstetrician under the circumstances present in the case by testifying that they taught obstetric nursing programs and worked with nurses under similar circumstances. Wingo, 292 Ill. App. 3d at 903-04, 686 N.E.2d at 727. Therefore, the court in Wingo concluded that the proffered experts in that case were qualified "to testify about what [a physician] is entitled to rely upon in the area of communication from a nurse in the context of an obstetrical team rendering care to a patient in a hospital." Wingo, 292 Ill. App. 3d at 906, 686 N.E.2d at 729.

Thus, Wingo relieves a party of satisfying the licensing prong of the Purtill foundational test where the allegations of negligence concern communications between members of different schools of medicine acting as part of the same team. Wingo, 292 Ill. App. 3d at 906, 686 N.E.2d at 729. However, the party offering the expert testimony must still satisfy the second prong of the Purtill test by establishing that the allegations of negligence were within that expert's knowledge and expertise. See Wingo, 292 Ill. App. 3d at 906, 686 N.E.2d at 729.

More recently, in Garley, this court considered the effect of Sullivan on Wingo, with the plurality of the court concluding that Wingo remains viable. Writing for the majority, Justice Quinn characterized Sullivan as creating a rigid, formalistic, bright-line licensing rule barring any doctor from testifying to the standard of care relevant to any other type of medical professional. Garley, 351 Ill. App. 3d at 409-10, 813 N.E.2d at 1040.

To the extent that Justice Quinn's opinion in Garley holds that Sullivan overruled Wingo, we

17

disagree. See Garley, 351 Ill. App. 3d at 411-12, 813 N.E.2d at 1042. Justices Greiman and Hartman also disagreed and wrote separately in Garley. Justice Greiman's specially concurring opinion in Garley pointed out that the supreme court in Sullivan specifically distinguished Wingo. Sullivan, 209 Ill. 2d at 118-19, 806 N.E.2d at 657; Garley, 351 Ill. App. 3d at 413-14, 813 N.E.2d at 1043-44 (Greiman, J., specially concurring). Thus, the specially concurring opinion criticized Justice Quinn's characterization of the rule of law from Sullivan and concluded that Wingo remained appropriate precedent to follow in that case. Garley, 351 Ill. App. 3d at 413-14, 813 N.E.2d at 1043-44 (Greiman, J., specially concurring). However, because the doctor experts in Garley did not limit their testimony to matters of communication, the specially concurring opinion ultimately agreed with the majority that Sullivan barred their testimony. Garley, 351 Ill. App. 3d at 413-14, 813 N.E.2d at 1043-44 (Greiman, J., specially concurring). The specially concurring opinion also criticized the foundation testimony on the second prong of the Purtill test, that the doctor experts taught or prepared relevant manuals, as lacking in depth or detail. Garley, 351 Ill. App. 3d at 415, 813 N.E.2d at 1044 (Greiman, J., specially concurring). Dissenting, Justice Hartman agreed that Wingo was still viable, but found that the issue had been waived because no objection was made to the doctors' testimony at trial. Garley, 351 Ill. App. 3d at 415-16, 813 N.E.2d at 1045 (Hartman, J., dissenting).

We agree with the specially concurring and dissenting opinions in Garley. Sullivan very clearly distinguished Wingo because it found that the "precise factual scenario" of communications between a nurse and a physician was not present in that case. Sullivan, 209 Ill. 2d at 118-19, 806 N.E.2d at 657. We therefore disagree with Justice Quinn's opinion in Garley on this point and find Wingo to remain appropriate precedent for this court to follow.

18

1-06-1007 & 1-06-1809 cons.

Applying this law to the present case, the only testimony in the record relating to the standard of care for a non-physician employee of CMA is Dr. Kucich's one-line admission on cross-examination during defendants' case-in-chief that "[i]f my office knew [about the December 2, 1996 culture result] and didn't tell someone, then yeah, there's a breach of standard of care." This case falls squarely within the exception to the licensing requirement articulated in Wingo. Although Dr. Kucich is not a nurse, plaintiff's theory of negligence concerns what Dr. Kucich's nurse, Sue Wesensten, or some other staff member should have communicated to him regarding the December 2, 1996 culture of Petre. Therefore, under Wingo, plaintiff is relieved of satisfying the licensing requirement of the Purtill foundational test for qualification of an expert.

However, we find that this testimony cannot be used as evidence of the standard of care for a non-physician employee of CMA because it fails to satisfy the second of the Purtill foundational requirements. Dr. Kucich's testimony never established that he was familiar with the methods, procedures, and treatments ordinarily observed by other staff or employees of a medical practice like CMA. Although plaintiff maintains that because CMA was Dr. Kucich's medical corporation, he was "obviously" knowledgeable about its practices and procedures, Dr. Kucich never actually explained on the record what protocols or procedures were in place for how, when, and why to take cultures or how, when, and why to notify patients and other personnel about the results. Rather, Dr. Kucich alluded to, but never elaborated upon, the fact that there were "standard procedure[s]" in place for taking and following up on cultures. Dr. Kucich also suggested that how, when, and who would perform these tasks would "depend upon the circumstances," but never elaborated on what circumstances would dictate what procedure. Without this foundational testimony, Dr. Kucich could

19

not have rendered an opinion on the relevant standard of care.

Dr. Kucich's testimony here is a sharp contrast to the testimony presented in Wingo, in which the proffered experts established that they were not only familiar with what a nurse would have communicated to a doctor under similar conditions, but also that they taught nurses what to tell doctors under similar conditions. Wingo, 292 Ill. App. 3d at 903-04, 686 N.E.2d at 727. Because Dr. Kucich's testimony fails to satisfy this foundational requirement of the Purtill test, he was not qualified to render an opinion on the standard of care for what a nurse should have communicated to a doctor regarding a culture result. Therefore, Dr. Kucich's testimony that "[i]f my office knew [about the December 2, 1996 culture result] and didn't tell someone, then yeah, there's a breach of standard of care," should not have been considered by the jury as evidence of the standard of care. Without any competent expert testimony to establish the standard of care for any non-physician employee of CMA, we must conclude that the jury's verdict was against the manifest weight of the evidence and that the trial court abused its discretion in denying CMA a new trial.

In reaching this conclusion, we must also recognize that plaintiff never requested and the jury was never given an instruction on how to determine the standard of care for anyone other than a doctor. As noted above, the only instruction the jury was given, a modified form of IPI Civil (2006) No. 105.01, described how to determine the standard of care for a doctor. "Each litigant has the right to have submitted to the jury instructions which inform the jurors of the issues presented, the principles of law to be applied, and the necessary facts to be proved in support of a verdict." Howat v. Donelson, 305 Ill. App. 3d 183, 186, 711 N.E.2d 440, 442 (1999). In addition, juries do not possess roving commissions to award damages as they please but, rather, must be given legal

20

1-06-1007 & 1-06-1809 cons.

standards to guide them. Tri-G, Inc. v. Burke, Bosselman & Weaver, 222 Ill. 2d 218, 252, 856 N.E.2d 389, 408-09 (2006). Without an instruction on the standard of care for anyone other than a doctor, the jury's verdict cannot be justified by hypothesizing that the jury applied some other theory. See Tri-G, 222 Ill. 2d at 252, 856 N.E.2d at 409.

On appeal, plaintiff attempts to rely upon a line of cases dealing with institutional negligence to assert that Dr. Kucich's testimony regarding the standard of care was proper. However, plaintiff's case against CMA was never based on a theory of institutional negligence, which is a theory of negligence based on hospital policies or procedures, rather than on the acts of professionals working for the hospital. See Darling v. Charleston Community Memorial Hospital, 33 Ill. 2d 326, 330-331, 211 N.E.2d 253, 256-57 (1965) (discussing a hospital's duty to a patient in an institutional negligence case); Bryant v. LaGrange Memorial Hospital, 345 Ill. App. 3d 565, 574-75, 803 N.E.2d 76, 84 (2003) (distinguishing medical malpractice claim based on negligence of professionals from an institutional negligence claim against a hospital). Rather, as plaintiff's complaint makes clear, plaintiff's theory against CMA was based on vicarious liability for some negligent act or omission of a CMA employee. Moreover, the jury was only given instructions pertaining to a vicarious liability theory; it was never given an instruction on institutional negligence. Because the jury ultimately found that Dr. Kucich did not act negligently, a vicarious liability negligence claim against CMA could only be based on the negligent act or omission of some other employee of CMA.

However, as we have just discussed, the only evidence upon which the jury could have based such a verdict was not competent. Dr. Kucich, who was the only expert offered by plaintiff to testify regarding the standard of care for a non-physician employee of CMA, was not qualified to render

21

1-06-1007 & 1-06-1809 cons.

such an opinion. Because there was no competent testimony regarding the standard of care for such an employee, we find that the jury's verdict was against the manifest weight of the evidence. We therefore conclude the trial court abused its discretion in denying CMA's motion for a new trial.

Accordingly, we reverse the judgment of the trial court and remand this cause for a new trial. Because we find that reversal is warranted based on this issue, we need not consider CMA's remaining contentions in this appeal.

Reversed and remanded.

GREIMAN and KARNEZIS, JJ., concur.