Filed 7/29/08          NO. 4-07-0754

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| KIMBERLY A. PETRYSHYN, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| BARRY SLOTKY, M.D., Individually; and | ) | No. 04L73 |
| BARRY SLOTKY, M.D., S.C., | ) | |
| Defendants-Appellants, | ) | |
| and | ) | |
| OSF HEALTH CARE SYSTEM, d/b/a | ) | Honorable |
| ST. JOSEPH MEDICAL CENTER, | ) | Charles G. Reynard, |
| Defendant. | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the opinion of the court:

This case presents the question of whether a physician may be qualified to testify as an expert regarding the standard of care of a nurse who was a surgical team member. We hold that the physician in this case was so qualified.

Plaintiff, Kimberly A. Petryshyn, sued defendants, Barry Slotky, M.D., S.C., and OSF Health Care System, d/b/a St. Joseph Medical Center, alleging medical malpractice, based on complications she suffered after undergoing a March 1999 cesarean-section surgery (hereinafter the C-section). St. Joseph Medical Center and Petryshyn later settled. Following a March 2007 trial, with Slotky as the sole defendant, a jury returned a verdict in his favor.

In April 2007, Petryshyn filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial, arguing that the trial court erred by admitting into evidence her expert physician's testimony--which she elicited in an evidence

deposition--regarding the applicable nursing standard of care. Following an August 2007 hearing, the court granted her motion for a new trial.

Slotky appeals the trial court's decision granting Petryshyn's motion for a new trial. We reverse.

## I. BACKGROUND

In March 1999, Petryshyn experienced labor pains and was admitted to St. Joseph Medical Center as Slotky's patient. Slotky placed an intrauterine pressure catheter (hereinafter IUPC) into Petryshyn's uterus to monitor the strength and frequency of her labor contractions. Because Petryshyn's labor was not progressing normally, Slotky performed a nonemergency C-section and successfully delivered Petryshyn's child.

In July 1999, Petryshyn first experienced an uncomfortable "poking" or "stabbing" pain in her pelvic region. From April through July 2000, Petryshyn sought treatment from another physician on six different occasions, complaining of (1) extreme lower abdominal pain, (2) heavy bleeding, and (3) urinary and bowel pain. In August 2000, she again sought medical treatment for stabbing abdominal pains that had steadily increased in severity and frequency. A pelvic examination revealed that a "pointy" foreign object was protruding from her left vaginal wall. An ultrasound and X-ray later revealed that the foreign object, which contained an electronic connecting wire, was inside Petryshyn's pelvis. The foreign object was later removed and identified as an 11.3-centimeter portion of an IUPC.

- 2 -

Petryshyn sued Slotky and St. Joseph Medical Center, alleging medical malpractice. As earlier noted, prior to trial, Petryshyn settled with St. Joseph Medical Center, which is not a party to this appeal.

In February 2007, David M. Priver, a board-certified physician in obstetrics and gynecology with 33 years of experience, testified as Petryshyn's expert in an evidence deposition. At a March 2007 hearing (immediately prior to the jury trial) which occurred after Petryshyn settled with St. Joseph Medical Center, Petryshyn moved to disavow the portion of Priver's evidence deposition testimony that pertained to the nursing standard of care. Because Slotky had previously disclosed to Petryshyn that he adopted Priver's opinion testimony pursuant to Supreme Court Rule 213 (210 Ill. 2d R. 213), he sought to introduce the testimony Petryshyn moved to disavow pursuant to Supreme Court Rule 212(c) (210 Ill. 2d R. 212(c)). See <u>Adams v. Sarah Bush Lincoln Health Center</u>, 369 Ill. App. 3d 988, 1001, 874 N.E.2d 100, 111 (2007), quoting <u>Prince v. Hutchinson</u>, 49 Ill. App. 3d 990, 995, 365 N.E.2d 549, 552 (1977) ("'An evidence deposition is not the "property" of the party who takes it, and any portion of an evidence deposition may be offered by either side'"). Petryshyn objected, arguing that Priver's testimony concerning the nursing standard of care--testimony that she elicited on direct examination in the evidence deposition--was inadmissible under the decision of the Supreme Court of Illinois in <u>Sullivan v. Edward Hospital</u>, 209 Ill. 2d 100, 119, 806 N.E.2d

645, 657 (2004).  After considering the parties' arguments, the court overruled Petryshyn's objection, finding that Priver's testimony regarding the nursing standard of care was "integrally related" to the functions of the surgical "team."  The record shows that the "surgical team" involved in Petryshyn's C-section consisted of two nurses and Slotky.

On direct examination, Priver testified that a pregnant patient's overall labor status is monitored through an IUPC. Priver explained that an IUPC has an electronic pressure sensor that is inserted into the patient's uterine cavity through the birth canal and cervix to monitor (1) uterine-contraction duration and (2) the fetus' heartbeat.  Additionally, the IUPC contains an internal wiring device that connects the pressure sensor to an external recording device.  Priver also stated that although a physician inserts the IUPC in the uterus, it is normally removed by a nurse prior to childbirth.

Priver further explained that a C-section is a surgical procedure involving a small initial incision in the patient's lower abdomen.  The initial incision is usually extended by using "bandage scissors," so called because they are blunt instruments that do not harm a patient's internal organs.  Priver stated that following the C-section, the operating room staff typically performs a "sponge and instrument count" to confirm that no foreign objects remain in a patient's body.  Priver opined that if a foreign object were to remain in a patient's body, it could cause infection, pain, and hemorrhaging.

- 4 -

Priver reviewed Petryshyn's medical records and depositions and opined that within a reasonable degree of medical certainty, (1) the IUPC (a) had not been removed when Petryshyn's C-section began and (b) was cut by bandage scissors as Slotky extended the initial incision, (2) approximately 10 centimeters of the IUPC remained inside Petryshyn's uterus after the C-section, (3) the retained portion of the IUPC would have been discovered if Slotky had manually examined Petryshyn's uterus, and (4) Slotky violated the physician's standard of care by (a) allowing the IUPC to remain in Petryshyn's uterus and (b) failing to check the uterus before closing the C-section incision. Priver based his last opinion on the fact that the labor-and-delivery records contained no showing that Slotky had conducted a manual examination of Petryshyn's uterus.

Priver also opined that within a reasonable degree of medical certainty, the nurses violated their standard of care by not inspecting the IUPC to ensure that it was intact before discarding it. Priver further testified that if the nurses had seen that the IUPC was not intact, it would have been within their standard of care to communicate their inspection results to Slotky.

On cross-examination, Priver acknowledged that (1) although Slotky had placed the IUPC in Petryshyn's uterus, the medical records did not identify who removed the portion of the IUPC that did not remain in Petryshyn's uterus and (2) a manual examination of the uterus is not always noted in the labor-and-

delivery records.  (Slotky testified that he did perform a manual examination of Petryshyn's uterus, even though he did not so note in the labor-and-delivery records.)

In Slotky's closing argument, he reminded the jury that Petryshyn's expert, Priver, testified that the operating room nurses failed to perform their required duties to (1) remove the IUPC prior to the C-section, (2) inspect all of the operating room equipment following the C-section, and (3) report to Slotky if any of the equipment was not intact.  Essentially, Slotky argued that because Petryshyn's own expert testified that the nurses failed to perform their duty, it was not appropriate for the jury to hold him liable for Petryshyn's injuries, given that the nurses violated their standard of care.  The jury later returned a verdict in Slotky's favor.

In April 2007, Petryshyn filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial, arguing that the trial court erred by allowing Priver's testimony regarding the applicable nursing standard of care.  Following an August 2007 hearing on Petryshyn's motion, the court granted the motion for a new trial, concluding that, based upon the authority of Garley v. Columbia LaGrange Memorial Hospital, 351 Ill. App. 3d 398, 813 N.E.2d 1030 (2004), the court had erred by permitting the jury to hear the portion of Priver's testimony regarding the nursing standard of care.

This appeal followed.

## II. ANALYSIS

### A. The Standard of Review

Slotky argues that the appropriate standard of review is de novo because the trial court erred as a matter of law by relying on Garley, which does not accurately reflect the current state of the law. Petryshyn responds that this court's review is under the abuse-of-discretion standard. We agree with Petryshyn.

A trial court's determination to grant or deny a new trial will not be disturbed absent an abuse of discretion. Smith v. Silver Cross Hospital, 339 Ill. App. 3d 67, 74, 790 N.E.2d 77, 84 (2003); see also Lisowski v. MacNeal Memorial Hospital Ass'n, 381 Ill. App. 3d 275, 283, 885 N.E.2d 1120, 1130 (2008) (where the First District, using the abuse-of-discretion standard, reversed the trial court's order for a new trial in a medical-malpractice case). "'"Abuse of discretion" means clearly against logic; the question is not whether the appellate court agrees with the [trial] court, but whether the [trial] court acted arbitrarily, without employing conscientious judgment,'" or whether, considering all the circumstances, the court acted unreasonably and ignored recognized principles of law, which resulted in substantial prejudice. Long v. Mathew, 336 Ill. App. 3d 595, 600, 783 N.E.2d 1076, 1080 (2003), quoting State Farm Fire & Casualty Co. v. Leverton, 314 Ill. App. 3d 1080, 1083, 732 N.E.2d 1094, 1096 (2000).

B. The Evolution of an Expert Physician's Testimony Regarding
a Health-Care Professional's Standard of Care

## 1. The Licensing Requirement

In Dolan v. Galluzzo, 77 Ill. 2d 279, 281, 396 N.E.2d
13, 15 (1979), the question before the Supreme Court of Illinois
was whether a physician, surgeon, or other medical expert not
licensed as a podiatrist could testify to the standard of care a
podiatrist owes to his patient.  The supreme court held that as a
matter of first impression, (1) "to testify as an expert on the
standard of care in a given school of medicine, a witness must be
licensed therein" and (2) after the licensing requirement has
been established, the trial court has the discretion to "deter-
mine if the witness is qualified to testify as an expert regard-
ing the standard of care."  Dolan, 77 Ill. 2d at 285, 396 N.E.2d
at 16.  In so holding, the supreme court stated that the ratio-
nale behind the licensing requirement was that different schools
of medicine have varying tenets and practices, and allowing a
practitioner of one school of medicine to testify to the care and
skill of another practitioner from a different school of medicine
would result in inequities.  Dolan, 77 Ill. 2d at 283, 396 N.E.2d
at 16.  Thus, "[t]he practitioner of a particular school of
medicine is entitled to have his conduct tested by the standards
of his school."  Dolan, 77 Ill. 2d at 283, 396 N.E.2d at 16.

## 2. The Exception to the Licensing Requirement

In Wingo v. Rockford Memorial Hospital, 292 Ill. App.
3d 896, 903-04, 686 N.E.2d 722, 727 (1997), three expert physi-
cians testified that a nurse deviated from her standard of care

- 8 -

by failing to properly communicate the condition of a pregnant patient to the treating physician.  Because the nurse failed to communicate her observations to the physician, the testifying experts opined that the nurse's deviation from her standard of care resulted in the patient's baby being born with brain damage. Wingo, 292 Ill. App. 3d at 903-04, 686 N.E.2d at 727.

The Second District in Wingo concluded that Dolan's licensing requirement did not apply to the facts of the case based on the following rationale:

> "[Dolan] indicate[s] that the reason for the
> [licensing requirement] is to prevent a
> higher standard of care being imposed upon
> the defendant and to ensure that the testify-
> ing expert has expertise in dealing with the
> patient's medical problem and treatment and
> that the allegations of negligence are within
> the expert's knowledge and observation.
> Those concerns have not been sacrificed here.
> In [this] case, the allegations of negligence
> against [the] nurse did not concern a nursing
> procedure but, rather, related to what a
> nurse is required to communicate to a physi-
> cian about what transpired since the physi-
> cian last saw the patient.  As such[,] the
> allegations of negligence do not concern an
> area of medicine *** [where] there would be a

different standard [of care] between [a] physician and another school of medicine. Furthermore, it was established that the allegations of negligence were well within the testifying doctors' knowledge and experience. We believe that a physician should be entitled to testify about what he or she is entitled to rely upon in the area of communication from a nurse in the context of an obstetrical team rendering care to a patient in a hospital." (Emphasis added.) Wingo, 292 Ill. App. 3d at 906, 686 N.E.2d at 729.

   3. The Supreme Court's Decision in Sullivan

In Sullivan, 209 Ill. 2d at 119, 806 N.E.2d at 657-58, the Supreme Court of Illinois barred a physician's expert testimony, holding that physicians cannot testify regarding (1) the standard of care for nursing procedures or (2) a nurse's deviation from her standard of care. In doing so, the supreme court reaffirmed Dolan's licensing requirement. Sullivan, 209 Ill. 2d at 113, 806 N.E.2d at 654. The supreme court in Sullivan also discussed some cases since Dolan, specifically focusing on Purtill v. Hess, 111 Ill. 2d 229, 489 N.E.2d 867 (1986).

In Purtill, an expert physician's affidavit stated that the treating physician deviated from his standard of care by failing to diagnose and treat the plaintiff's medical condition. Purtill, 111 Ill. 2d at 238, 489 N.E.2d at 870. The trial court

granted the physician's motion (1) to strike the expert's affidavit and (2) for summary judgment, finding that the expert had failed to demonstrate he was familiar with the standard of care in the treating physician's geographical location or similar location.  Purtill, 111 Ill. 2d at 238-39, 489 N.E.2d at 870-71. Because the expert demonstrated that he was familiar with the minimum standards and that the standards were uniform throughout the country, the supreme court reversed the trial court's judgment and held that the expert physician was qualified to testify to the physician's standard of care.  Purtill, 111 Ill. 2d at 250-51, 489 N.E.2d at 876-77.  In so holding, the supreme court in Purtill clarified the test of an expert physician's qualifications to testify about a health-care professional's standard of care.

Specifically, the supreme court in Sullivan stated:

"'In Purtill[, 111 Ill. 2d at 243, 489 N.E.2d at 872-73], this court articulated the requirements necessary to demonstrate an expert physician's qualifications and competency to testify.  First, the physician must be a licensed member of the school of medicine about which he proposes to testify. [Citation.]  Second, "the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the

defendant physician's community or a similar community." [Citation.] Once the founda- tional requirements have been met, the trial court has the discretion to determine whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care. [Citation.]'" Sullivan, 209 Ill. 2d at 112-13, 806 N.E.2d at 654, quoting Jones v. O'Young, 154 Ill. 2d 39, 43, 607 N.E.2d 224, 225 (1992).

Thus, if the expert physician fails to satisfy either founda- tional requirement, he is not qualified to testify as an expert. Sullivan, 209 Ill. 2d at 113, 806 N.E.2d at 654.

As explained in Dolan, the rationale for the supreme court's prohibition regarding a physician's testimony pertaining to another health-care professional's standard of care stems from the court's concern that fairness requires the practitioner of a particular school of medicine to have his conduct tested by the standards of his school. Dolan, 77 Ill. 2d at 283, 396 N.E.2d at 16. Thus, when a physician does not have the requisite training or experience in the school of medicine about which she proposes to testify as an expert, the trier of fact should not hear that testimony. In other words, even though they are all physicians, orthopedic surgeons are not qualified to testify regarding the standard of care (and any alleged breach thereof) applicable to pediatricians; nor are radiologists qualified to testify regard-

- 12 -

ing those subjects applicable to dermatologists; and so on.  See Garley, 351 Ill. App. 3d at 409, 813 N.E.2d at 1040 (physicians were not qualified to testify to (1) the nurses' standard of care or (2) whether the nursing staff deviated from their standard of care); Alm v. Loyola University Medical Center, 373 Ill. App. 3d 1, 6, 866 N.E.2d 1243, 1248 (2007) (pathologist was not familiar with the methods, procedures, and treatments ordinarily observed by specialists in plastic surgery and anesthesiology to qualify as an expert).

However, the supreme court in Sullivan noted Wingo's limited exception to this licensing requirement.  Specifically, the supreme court observed that the case before it was factually more similar to Dolan and its progeny than to Wingo.  Sullivan, 209 Ill. 2d at 118-19, 806 N.E.2d at 657.  That may explain why the supreme court in Sullivan expressly refused to discuss the merits of Wingo or to overrule it.  Sullivan, 209 Ill. 2d at 119, 806 N.E.2d at 657.  Indeed, in Petre v. Cardiovascular Consultants, S.C., 373 Ill. App. 3d 929, 942, 871 N.E.2d 780, 792 (2007), the First District reaffirmed that Wingo remained an appropriate precedent to follow.  Specifically, the Petre court stated that "Wingo relieves a party of satisfying the licensing prong of the Purtill foundational test when the allegations of negligence concern communications between members of different schools of medicine acting as part of the same team."  Petre, 373 Ill. App. 3d at 941, 871 N.E.2d at 792.  However, the party offering the expert testimony still must satisfy Purtill's second

- 13 -

prong by establishing that the negligence allegations were within the expert's knowledge and expertise.  Petre, 373 Ill. App. 3d at 941, 871 N.E.2d at 792.

C. The "Providing-Medical-Care Continuum"

As earlier stated, this case presents the question of whether a physician may be qualified to testify as an expert regarding the standard of care expected of a nurse who was a surgical team member.  The pivotal analytical issue in answering this question depends on the nature of the interaction between a physician and a nurse as they provide medical care for the same patient.  At one end of the "providing-medical-care continuum" are cases like Sullivan and Garley, which focus separately on the specialized nature of the medical care being provided by the physician or nurse, rather than on the interaction between them, because that interaction is not intrinsically intertwined with the care that they are individually providing.

In the middle of the "providing-medical-care continuum" are cases like Wingo, which recognize that the distinct and specialized procedures that a physician and nurse employ to effectively care for the same patient do not occur absent inter-active communication.  Thus, Wingo focused on the intrinsically intertwined interaction between a physician and nurse, albeit on the limited and narrow scope of communication, rather than focusing separately on the specialized nature of the medical care being provided by the physician or nurse.

Cases in the middle of the "providing-medical-care

- 14 -

continuum" typically involve allegations of negligence--such as a nurse's failure to communicate to a physician an issue that fell within her standard of care--which, in turn, had a negative impact upon the physician's ability to effectively treat the same patient.  Because such allegations of negligence do not involve testimony concerning another health-care professional's standard of care or the breach of that care, <u>Dolan</u>'s licensing requirement does not apply.  Therefore, a physician may testify as in <u>Wingo</u>, provided that such testimony is within his knowledge and expertise.

Progressing still further along the "providing-medical-care continuum" is a case like the present one, which involves the intrinsically intertwined interaction between a physician and nurse when they are members of the same surgical team.  Under this scenario, which is essentially on the opposite end of the "providing-medical-care continuum" from the circumstances in <u>Dolan</u>, the physician and nurse, each responsible for their distinct and specialized responsibilities, interact as a team to substantially contemporaneously care for the same patient.  This case is also distinguished from <u>Wingo</u> and the middle of the "providing-medical-care continuum" because <u>Wingo</u> involved only communication between the physician and a nurse rather than the level of interaction required of a physician and nurse on the same surgical team.

D. Priver's Expert Testimony Regarding the Standard of Care Expected of Surgical Team Members

In medical-malpractice cases, the basic question is

- 15 -

who, if anyone, has deviated from his or her standard of care. This case is no different. Slotky and the nurses carried out their respective specialized duties as part of a surgical team to (1) prepare Petryshyn for the C-section, (2) perform the C-section, and (3) conduct the postoperative care. During that time, something happened to Petryshyn that should not have happened--that is, a portion of the IUPC remained in her body after the C-section. Given that error, the parties were entitled to present evidence and argument concerning which, if any, member of the surgical team departed from his or her standard of care.

In this case, Priver was a board-certified physician in obstetrics and gynecology with 33 years of experience who performed an average of 30 to 40 C-sections per year. Thus, he had the requisite expertise and knowledge regarding the responsibilities of the individual surgical team members involved in such procedures. In his evidence deposition, Priver testified, in part, that (1) in preparing a patient for the C-section, the IUPC is normally removed by nurses, (2) the IUPC had not been removed when Petryshyn's C-section began, (3) a nurses' postoperative responsibilities include (a) performing a "sponge and instrument count" and (b) inspecting the instruments used during the C-section to ensure they remained intact, and (4) if the nurses had seen that the IUPC was not intact, it would have been within their standard of care to communicate their inspection results to Slotky. Essentially, Priver's testimony pertains to a physician's and nurse's distinct and specialized responsibilities as

surgical team members and the intrinsically intertwined interaction between those responsibilities as the physician and nurse care for the same patient.

Under the circumstances in this case, Priver was qualified to testify as an expert that (1) a surgical team physician conducting a C-section relies on communication from nurse team members regarding the patient's care and (2) the failure to communicate information about the patient was a breach of the nurse's standard of care.

In its initial pretrial ruling, the trial court characterized Priver's testimony as follows:

> "I think we are dealing with integrally[]
> related obligations within the standard of
> care according to [Priver] that says it's the
> nurse[']s obligation to do that and I know
> this because I have been on this team situa-
> tion for many years, done it many times and
> it's the nurse's obligation to do the count
> or to inspect the instruments and then commu-
> nicate accordingly."

Later, at the hearing on Petryshyn's motion for a new trial, the court explained its rationale for permitting the jury to hear Priver's testimony as follows:

> "It was apparent to me at that time that the
> communication protocol was a significant one
> that [Slotky] ought to be able to produce

- 17 -

evidence about, because professionals rely upon other members of the team communicating to them and tied in with the defense theory of this case that it was someone else's fault, someone else's duty, someone else's breach of duty[,] and someone else's conduct that proximately caused the injuries to [Petryshyn]."

However, the court nonetheless ruled that it should not have admitted Priver's testimony regarding the nurses' standard of care and granted Petryshyn's motion for a new trial. We conclude that the trial court's characterization of Priver's testimony and the rationale for its initial ruling was correct and consistent with this court's analysis.

The rationale underlying <u>Sullivan</u> was not implicated in this case. Accordingly, we conclude that the trial court abused its discretion by granting Petryshyn's motion for a new trial.

### III. CONCLUSION

For the reasons stated, we reverse the trial court's order granting a new trial.

Reversed.

KNECHT, J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

I respectfully dissent and would affirm the decision of the trial court.

On March 4, 1999, Plaintiff Petryshyn went into labor and was admitted to St. Joseph Medical Center under the care of defendant Dr. Slotky. As a part of Petryshyn's care during labor, Dr. Slotky inserted an IUPC into her uterus. Thereafter the decision was made to perform a nonemergency C-section, during which the IUPC was cut, leaving an approximately 11.3-centimeter portion of the IUPC in Petryshyn's uterus. Petryshyn continued to experience pain until the IUPC was discovered and removed by Dr. Vincente Colon in August 2000. In 2004, Petryshyn filed this lawsuit against Dr. Slotky and St. Joseph Medical Center, which employed the nurses. Shortly before the trial began, in March 2007, St. Joseph Medical Center settled and was dismissed from the lawsuit.

The evidence deposition of Petryshyn's expert, Dr. Priver, was taken in February 2007, before St. Joseph settled out. Dr. Priver opined that (1) the IUPC was cut by Dr. Slotky as he performed the C-section, (2) the remaining portion would have been discovered if Slotky had manually examined Petryshn's uterus, and (3) Slotky violated the physician's standard of care by failing to properly check the uterus before closing the C-section incision. Dr. Priver also opined that the nurses violated their standard of care by not inspecting the IUPC to ensure that it was intact before discarding it. At trial, as the nurses

were no longer part of the case, Petryshyn chose not to introduce the portion of Priver's deposition testimony that the nurses violated their standard of care.  However, upon Slotky's request, the trial court required the testimony to be admitted.

In closing argument, defense counsel misrepresented Priver's testimony to say the nurses violated their standard of care by not removing the catheter before the C-section and by not telling Dr. Slotky about it.  After seeing how Priver's testimony was used during trial, the trial court decided the testimony should not have been admitted and ordered a new trial.  The trial court believed the jury would have ruled differently if the evidence had not been admitted:  "I can relate back to my recol-lection at the time of closing argument as to how strong an argument was made by [defense counsel] when he pointedly took the nurses to task, took the demeanor of one of the nursing witnesses to be almost tantamount to a confession."  "I have to believe that based upon those recollections, that that argument had its intended effect."  Defense counsel had argued:

> "Is it appropriate?  Is it appropriate for
> the jury to hold Dr. Slotky responsible
> because [nurse] Marla Newman didn't do her
> job?  All I could think of when I was lis-
> tening to Dr. Priver's testimony was how
> much he talked about the nurses.  How the
> nurses failed.  I wrote these things down.
> Almost every time, the nurses take out

the IUPC. This is plaintiff's expert, ladies and gentlemen. This isn't the defense expert."

How was it even relevant whether the nurses were negligent? The question was whether Dr. Slotky was negligent. More than one person may be to blame for causing an injury. If Dr. Slotky was negligent and his negligence was a proximate cause of the injury to plaintiff, it is not a defense that the nurses may also have been to blame. Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1989) (hereinafter IPI Civil 3d No. 12.04). A defendant is not allowed to divert the jury's attention from his negligence by dirtying up an absent defendant.

Slotky asked the trial court to give the second paragraph of IPI Civil 3d No. 12.04, that the jury should rule for the defendant if it decides "that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant." (Emphasis added.) That instruction, however, should be used only where there is evidence to show that the sole proximate cause of the occurrence was the conduct of a third person. IPI Civil 3d No. 12.04, Notes on Use, at 12-9. Where the defendant never argued or presented evidence that "only" the negligence of persons other than the defendant proximately caused the plaintiff's injury, the sole-proximate-cause instruction is properly refused. McDonnell v. McPartlin, 192 Ill. 2d 505, 522, 736 N.E.2d 1074, 1085 (2000). A sole-proximate-cause instruction is not appropriate unless there is evidence that the sole proxi-

mate cause (not <u>a</u> proximate cause) of a plaintiff's injury is conduct of another person or condition. <u>Holton v. Memorial Hospital</u>, 176 Ill. 2d 95, 134, 679 N.E.2d 1202, 1219 (1997).

The Supreme Court of Illinois held that a sole-proximate-cause instruction was properly given in <u>Leonardi v. Loyola University of Chicago</u>, 168 Ill. 2d 83, 101, 658 N.E.2d 450, 459 (1995), but that was a case where two physicians dis-agreed over how to proceed. The treating physician had counter-manded the resident's order to test blood gases. The resident was required to follow the treating physician's orders, and the treating physician was accordingly alleged to have been the sole proximate cause of the injury. Either the treating physician was the proximate cause or the resident was the proximate cause, but not both. <u>Leonardi</u>, 168 Ill. 2d at 97, 658 N.E.2d at 457. <u>Leonardi</u> is nothing like the present case, where there was no disagreement, where the operating surgeon simply complained that his subordinates failed to discover his mistake. Evidence that the nurses were negligent does not mean that Dr. Slotky was not negligent. Even if the nurses were negligent, the injury would not have occurred if Dr. Slotky had properly checked the uterus before closing the C-section incision. <u>Leonardi</u> involved a situation where the physician giving orders was argued to be the sole proximate cause. The present case involves the converse, where the physician giving orders argues his subordinates are the sole proximate cause. A doctor may be held liable for the negligence of a hospital employee who is subject to the doctor's

control or supervision.  Foster v. Englewood Hospital Ass'n, 19 Ill. App. 3d 1055, 1061, 313 N.E.2d 255, 260 (1974) (captain of the ship).

Dr. Slotky argues that Petryshyn is estopped from denying testimony which Petryshyn elicited at Dr. Priver's evidence deposition.  A party taking an evidence deposition, however, may choose to use only a part of that deposition or not use the deposition at all.  "If only a part of a deposition is read or used at the trial by a party, any other party may at that time read or use or require him to read any other part of the deposition which ought in fairness to be considered in connection with the part read or used."  210 Ill. 2d R. 212(c).  The issue here, however, is not one of fairness or completeness, but whether Dr. Slotky may use an unconnected portion of an evidence deposition which Petryshyn chose not to use.

The Adams case, cited by the majority, actually refused to allow the party not taking the deposition to use a portion of the deposition that was not "connected" to the part of the deposition that was admitted, because it involved cross-examination beyond the scope of plaintiff's direct.  Adams, 369 Ill. App. 3d at 1002, 874 N.E.2d at 112.  "Defendants apparently chose not to depose Dr. Strasberg directly."  Adams, 369 Ill. App. 3d at 1002, 874 N.E.2d at 112.  There is a similar concern in the present case.  There may have been no problem if Dr. Slotky wanted to take Dr. Priver's testimony and introduce it.  It was unfair, however, to force Petryshyn to introduce Dr. Priver's

testimony and for Dr. Slotky then to argue, "This is the plaintiff's expert, ladies and gentlemen.  This isn't the defense expert.  This is plaintiff's expert."  Dr. Priver's testimony on nursing standards of care was elicited when the nurses were part of the lawsuit and was not part of plaintiff's testimony against Dr. Slotky.  There was no reason for Petryshyn to introduce it after St. Joseph Medical Center settled out.  It was Dr. Slotky who chose to present the testimony in a strategy to blame the nurses.

A physician who is not a licensed nurse cannot testify as to nursing standards of care.  Sullivan, 209 Ill. 2d at 112-13, 806 N.E.2d at 654.  Wingo involved a situation where a nurse observed the patient leaking fluid, but she failed to communicate this to the doctor.  Perhaps a physician should be entitled to testify about what he or she is entitled to rely upon in the area of communication from a nurse, but the Wingo exception should not be allowed to swallow up the rule that the expert must be a licensed member of the school of medicine about which he proposes to testify.  Every time a nurse violates her standard of care she should communicate that to the attending physician, but that does not mean that physicians may testify about every violation of the standard of care by a nurse.  In this case, Dr. Priver testified to a specific nursing violation of the standard of care: the nurses did not inspect the IUPC to ensure that it was intact before discarding it.  If that duty did not exist, there was no duty to communicate.

The trial judge observes the witnesses and is in a better position to determine whether a jury verdict is against the manifest weight of the evidence than is the reviewing court. Maple v. Gustafson, 151 Ill. 2d 445, 455-56, 603 N.E.2d 508, 513 (1992). A trial court's grant of a new trial accordingly will not be disturbed absent an abuse of discretion. Smith, 339 Ill. App. 3d at 74, 790 N.E.2d at 83. "'[T]he question is not whether the appellate court agrees with the [trial] court, but whether the [trial] court acted arbitrarily, without employing conscientious judgment ***.'" Long, 336 Ill. App. 3d at 600-01, 783 N.E.2d at 1080, quoting State Farm Fire & Casualty Co., 314 Ill. App. 3d at 1083, 732 N.E.2d at 1096. How can we say that a trial court acted arbitrarily, without employing conscientious judgment, when it grants plaintiff a new trial in a medical-malpractice case where an object was left in plaintiff's body following surgery? Rather than being an abuse of discretion, this seems to be res ipsa loquitor.